CHARLES MEFFERT v. MARTIN E. LAWSON, Executor of Last Will of JOSEPH F. MEFFERT, Appellant.

Division Two, July 19, 1921.

1. **NOTE: Implication of Payment.** It would be singular that a physician, actively engaged in the practice of medicine, making money in dealing in real estate, in which transactions he had continuous dealings with local banks, should not only borrow, but retain with-

289 Mo.—22

out any payments for almost ten years, considerable amounts of money from a brother, who, not shown to possess any unusual amount of property, combined the vocation of a barber with that of a druggist in a small town in another state; but these facts, though undisputed, are not substantial proof that the notes, if made, have been paid.

2. ———: Indorsements: Other Necessary Proof: Limitations. There is no presumption that the indorsement of a partial payment on a promissory note was made at the time it bears date; on the contrary, to remove the bar of limitations it is necessary to adduce other proof than the mere production of the note with a credit thereon bearing a date which would have that effect—proof showing that the credit was actually made by the owner of the note, or by his direction at a time when the note was not barred, or, by direct evidence, that the payment was actually made by the maker at such time.

3. ———: ———: ———: ———: Similarity of Handwriting. A judgment against a deceased maker's administrator on one note for $2950 on which a credit of $50 bearing date twenty days before the note would otherwise have been barred by limitations, and on another for $500 on which a credit of ten dollars bearing date twenty-three days before the note would otherwise have been barred, cannot stand where the only proof, aside from the mere production of the notes themselves, that the payments were made when dated or at any other time, was opinion evidence that there was a similarity in the handwriting of the indorsements and that of the purported maker. If there is no evidence aliunde when a credit is indorsed, there must be proof that the payment was, in fact, made.

4. ———: Alterations: Explanations: Presumption. Where an alteration or erasure upon a note appears suspicious—for instance, where chemical and handwriting experts testify that erasures had been made on the face of the notes, indicated by the scratched and roughened condition of the paper; that the ink used at the point of erasure was different in composition and color from that used elsewhere on the notes, and that the effect of the erasures in one instance was to change the sum payable and in another to change the date—they demand explanation. Such changes are material alterations, and in their presence the law does not presume that they were made at or prior to the execution of the notes, but it demands that they be satisfactorily explained.

5. EVIDENCE: Admission Made In Extremis. Admission of a statement made by the purported maker of the notes sued on at a time when he was in extremis is, error. And a statement that "I have

fixed his notes, and he will get his money," with no evidence connecting it with the notes sued on and none identifying the person referred to, even if made in a lucid interval, is inadmissible and prejudicial.

Appeal from Jackson Circuit Court.—*Hon. O. A. Lucas,* Judge.

REVERSED AND REMANDED.

*Lathrop, Morrow, Fox & Moore and George W. Day* for appellants.

(1)   The evidence should have been confined to the issues: (a) Were the notes altered in the respects asserted by defendant, and (b) did the indorsements upon the back of them, evidence an actual payment thereon? It was error, and highly prejudicial to defendant, to permit plaintiff to show that Dr. Meffert had stated that he owed his brother money on notes, without showing that he referred to the notes in question, and without limiting the effect of the evidence to the one question of alleged alteration. Cox v. Mignery, 126 Mo. App. 669; p. 1281, secs. 200, 201.   (2) The alterations were what the law terms "suspicious," and it was incumbent upon plaintiff to explain them.   It was also incumbent upon him to show that the indorsements on the two disputed notes, represented actual payments by the maker   to the plaintiff, to be credited thereon.   In neither of these respects did plaintiff discharge his obligation; therefore, the trial court erred in not sustaining the demurrers to the evidence as to these two notes, and in refusing to direct a verdict against them at the close of all the evidence.   R. S. 1909, secs. 1888, 1909, 1911; Clark v. Powell's Estate, 208 S. W. 31; Cox v. Mingery, 126 Mo. App. 669; Briscoe v. Huff, 75 Mo. App. 288; Elsea v. Pryor, 87 Mo. App. 157; Chapman v. Hogg, 135 Mo. App. 654.   (3)   It is a partial payment, not the formal credit, that revives a debt barred by the statute, or tolls

the running thereof. Clark v. Powell's Estate, 208 S. W. 31; Elsea v. Pryor, 87 Mo. App. 157; Chapman v. Hogg, 135 Mo. App. 654. (4) If the maker or the holder of a promissory note, makes an indorsement of a payment thereon, when it is against his interest so to do, it will be presumed that a payment was actually made and that it was not done merely to save the instrument from the bar of the Statute of Limitations. On the other hand, if it appears from the indorsement that it benefited the party making it, there must be proof that a payment thereon was actually made, for the statute declares that "a payment of any principal or interest" revives the debt or tolls the running of the statute. Plaintiff's evidence tended to show that the indorsements were in the handwriting of the maker, Dr. Meffert. If they were, they were for his benefit, inasmuch as the notes were not then barred, and he was thereby reducing the amount of his obligation. No payment was shown. The notes were barred. R. S. 1909, sec. 1911; Haver v. Schwyhart, 39 Mo. App. 303; Briscoe v. Huff, 75 Mo. App. 288; Crow v. Crow, 124 Mo. App. 120; Brown v. Carson, 132 Mo. App. 371; Smith v. Brinkley, 151 Mo. App. 494; Berryman v. Becker, 173 Mo. App. 346; Wester v. Wester's Estate, 189 S. W. 608. (5) Ratification of unauthorized acts implies knowledge of such acts. If Dr. Meffert wrote the indorsements upon the disputed notes, after the alterations thereof, it should have been further shown, that he knew of the alterations. It was not so shown. State v. Findley, 101 Mo. 368; Bremen Bank v. Umrath, 42 Mo. App. 525; Paul v. Leeper, 98 Mo. App. 515.

*Kelly, Buchholz, Kimbrell & O'Donnell* for respondent.

(1) The trial court did not err in admitting evidence showing that deceased made statements concerning the notes in question against his interest and concerning the amount of the indebtedness to plaintiff ex-

isting by virtue of said notes. (a) The testimony concerning the notes amounted to admissions against interest, and such admissions were competent in an action against the deceased's estate. McLaughlin v. McLaughlin, 16 Mo. 242. (b) The testimony as to the amount of the indebtedness was limited in its effect, by the court declaring to the jury that it was not admitted for the purpose of showing the execution of the notes or the indorsement, or for giving them vitality or effect, but simply for what it was worth with reference to the contention of the defendant that one of the notes was originally for twenty-nine dollars and fifty cents instead of for twenty-nine hundred dollars and fifty cents. These statements were admissions against interest which were competent against the estate of deceased on that issue. 1 Ency. Ev. 571-2. (c) In any event the defendant is estopped to complain of alleged error in the admission of said testimony for the reason that the said defendant introduced in evidence the statement of Mrs. Baker, a sister of deceased, and of Mrs. Meffert, the mother of deceased, concerning the notes and the indebtedness of the deceased to plaintiff, and hence if the admission was erroneous, defendant cannot now complain under the common error doctrine. Thorpe v. Railway, 89 Mo. 650; Aronovitz v. Arky, 219 S. W. 620; White v. Railway, 250 Mo. 476; 2 Ency. Pl. and Pr. 519; Christian v. Ins. Co., 143 Mo. 460; Reilly v. Railway, 94 Mo. 611; Holmes v. Braidwood, 82 Mo. 616; McGonigle v. Daugherty, 71 Mo. 259; Smith v. Culligan, 74 Mo. 388; Davis v. Brown, 67 Mo. 315. (2) The court did not err in refusing to give the peremptory instructions requested by the defendant. (a) When defendant admitted that the deceased executed the notes, the law presumed that the alleged alterations were made at or prior to the time of the execution of the notes, in the absence of a preliminary finding by the trial court that the alleged alterations were suspicious. Matthews v. Coulter, 9 Mo. 411; 1 Greenleaf, Evidence, 564; Lubering v. Kohlbrech-

er, 22 Mo. 596. (b) The statute required the court to presume, in the absence of evidence to the contrary, that the payments were made at the time they were indorsed and thus changed the rule announced in the decisions cited by appellant. R. S. 1919, sec. 798. (c) When plaintiff introduced evidence showing that the payments were indorsed on the back of the notes by the deceased, and when it was conceded by the appearance of the undisputed $200 note, and by the witnesses put on the stand by the defendant that the deceased was slovenly and careless in writing his notes, and occasionally wrote some of them standing on his head, the trial court had no choice in the matter, but was bound to submit the case to the jury, either by a peremptory instruction to find for the plaintiff or by the instructions by which it was submitted. Goddard v. Williamson's Adms., 72 Mo. 131; Gardner v. Earley, 78 Mo. App. 346; Rega v. Williams, 185 Mo. 631; Phillips v. Mahan, 52 Mo. 197; Ray v. McConnell, 179 Mo. App. 400; Smith v. Brinkley, 151 Mo. App. 494. (d) Anna Meffert, the daughter of deceased, and residuary legatee under the will, and hence the real defendant in the case, notwithstanding she was called as a witness on the part of the defendant, did not testify or deny that the alleged alterations and the indorsements of payments were in the handwriting of her deceased father, and for this reason alone the finding against defendant's contention was proper. Keime v. Railway, 254 Mo. 194; 1 Starkey on Ev. p. 54; Moore on Facts, pp. 571, 574, 575; McClanahan v. Railway, 147 Mo. App. 386; Cass Co. v. Green, 66 Mo. 512; Payne v. Railway, 136 Mo. 594; Schooler v. Schooler, 258 Mo. 83. (e) The statute (Sec. 5438, R. S. 1919) authorizes the admission in evidence of any writing proved to the satisfaction of the judge to be genuine and authorizes comparison of such writings with that in dispute by witnesses, and authorizes that such writings and the evidence of witnesses respecting same may be submitted to "the court and jury as evidence of the genuineness or otherwise of

the writing in dispute." Several of the writings admitted to be genuine and which the trial court and jury examined are not included in this record by photographic copy or otherwise. The omitted writings were admitted to be genuine. Their comparison with the disputed writing by the jury would have been sufficient alone to sustain a verdict even in a criminal case. State v. Scott, 45 Mo. 302. (3) The complaint against the instructions is that they authorized the jury to find that the bar of the Statute of Limitations applied to the notes, and that it was removed by a mere indorsement of a credit without an actual payment; but the instructions did not authorize the jury to find that if the deceased had merely made an indorsement of a fictitious payment on the notes they must find for the plaintiff, but the said instructions required the jury to find that the credits were indorsed not as fictitious but as payments, and it so prohibited the jury from finding for the plaintiff on each of the notes if they found an alteration of the notes in amount or date without the knowledge of deceased "after the date of said payment, if any." These instructions categorically referred to a payment in fact and not in a fictitious payment. (4) But defendant's instructions numbered 4 and 5 proceeded upon the theory that if the credits were not in the handwriting of the deceased, the finding should be for the defendant and impliedly authorized a finding for plaintiff if the deceased had merely indorsed the credits. That is to say, the trial theory of the defendant was based upon a concession of the fact that there was an actual payment if the deceased had indorsed the credits. Defendant will not now be permitted to change his trial theory. Mitchell v. Railways, 125 Mo. App. 11; Drug Co. v. Bybee, 179 Mo. 354; McDonnell v. Bldg. Assn., 175 Mo. 250; Black v. Ry., 172 Mo. 177; B. & L. Assn. v. Obert, 169 Mo. 507; Heman v. Larkin, 108 Mo. App. 393; Coal Co. v. Watson, 107 Mo. App. 451; Strother v. Dewitt, 98 Mo. App. 293.

WALKER, J.—The plaintiff filed a petition in the Probate Court of Jackson County, for the allowance of a claim against the estate of Joseph F. Meffert, based on three promissory notes alleged to have been made by the latter to the plaintiff. A verdict was rendered by a jury in favor of the plaintiff, from which an appeal was perfected to the circuit court. Upon a trial in that court a judgment was rendered May 2, 1919, in favor of plaintiff, from which the defendant appeals.

The petition on which this action is based is in three counts: The first is on a note made to plaintiff by Joseph F. Meffert, on November 14, 1901, for $2950 with the following indorsement on the back of same: "By cash, October 24, 1911, on within note $50." The second ' is on a note made to plaintiff by Joseph F. Meffert, November 14, 1902, for $500, with the following indorsement on the back of same: "By cash, October 21, 1912, on within note $10." The third is on a note made to plaintiff by Joseph F. Meffert, June 8, 1913, for $200. The last mentioned note is conceded to be valid and is not contested.

Thos. A. Hardwicke, a barber, testified for the plaintiff as to his familiarity with the handwriting of the deceased; that he had known the latter for about twenty years and had frequently seen him write; that he was careless in his writing; that he had none of his writing at the time, but had formerly had one or two prescriptions given him by the deceased, who was a doctor, and that he got one of these from a drug store where he had left it and it was exhibited to the jury; that this prescription was in the handwriting of the deceased; witness then identified the indorsements on the back of the notes as being in the same handwriting.

William Meffert, a brother of the plaintiff and of the deceased, testified to his familiarity with the handwriting of the latter; that the notes sued on and the indorsements thereon, were, in his opinion in the handwriting of the deceased. In response to an inquiry as to

whether he had had a discussion with the deceased a few
hours before his death, concerning amounts owing on
notes signed by the deceased, he replied that the de-
ceased said: "I have fixed his notes and he will get his
money." That this was practically all he said in connec-
tion with that matter. Further, that the "hundred and
twenty-nine" on one of the notes was in Dr. Joseph Mef-
fert's handwriting.

On cross-examination this witness stated that except
casually on two or three occasions he had not seen the
deceased for about twenty-five years; that when the
daughter of the deceased sent the witness word that her
father was dying, a day or two before his death, he at
first refused to go to see him, but finally went; that the
deceased was not conscious when the witness first saw
him, but that he brought him to consciousness. Continu-
ing, the witness said: "I say he was conscious and I
brought him there purposely. He was unconscious, he
was under the influence of hyocene, catcine and morphine
and they had been doping him with one shot right after
another until I arrived when I changed that formula. I
never saw him for probably two hours after I got there,
until he became conscious and then they asked for me to
be admitted. I treated him, after I arrived, to restore
consciousness. He was really muddled from hyocene,
what we call a mild delirium, due to the action of the
drug; he was not normal when I got there. In two hours
after, he knew people. He was still partially conscious,
practically you might say, in a sub-conscious state, under
the influence of a drug. I simply withdrew that, that
was early in the evening, after my arrival about ten
o'clock as I remember, I saw him about midnight, or pos-
sibly earlier, I cannot say the exact hour. I stopped
the administration of the drug, he talked to me in the
morning about eight o'clock, and died about five that
evening. I was with him that morning about three-
quarters of an hour; I saw him again, I was right with
him when he died. He was not conscious all the time.

He became conscious in the afternoon, about two or three o'clock, maybe four. The coma deepened until he became absolutely unconscious.

"There is no scratching or erasure on the $500 note that I can see. The handwriting on the back is Dr. Meffert's handwriting—the indorsement. So far as my judgment is concerned, I would say absolutely so. My reason, is familiarity with his handwriting; that I haven't seen it would make no difference. You get an impression of this case, don't you? You know that as well as I do and to show you a similiarity in that letter, this front part of the letter is one of the letters I refer to. This is one of the letters I found at home among other letters and I picked that up to compare this with your notes at the other trial; that is the reason I had this letter in my possession." There were two letters. Another letter was exhibited in regard to which the witness says: "That is also my brother's handwriting, that was written long years ago, probably twenty or twenty-five years ago." Then follows a long statement by the witness wholly irrelevant as to the nature of his personal relations with the deceased. On re-direct examination the witness said: "That note handed to me appears to have scratches on it, also this one, is certainly with those that are scratched. The word 'May' is written under the word 'June' in pencil on the $200 note. I cannot make that out, there is some writing there under "2," the word June has been written over that. It appears there under the words 'Chas. Meffert.' There has been some writing there that has been scratched out and in the $200 note. I did not visit with my brother, the Doctor, Joseph Meffert, in my mother's home when I went to Emporia; we never met there." On further cross-examination, the witness said: "I asked him (decd) in regard to Charley's note; he remarked, 'These notes were all right and would be paid.' That was the substance of what I testified to in the other trial."

Thos. A. Hardwicke, recalled for further cross-examination, said: "I never looked for any more prescriptions or receipts, my business is that of a barber; I have nothing to do with handwriting, only just our laundry and writing laundry names, different names. I am no expert; I saw the Doctor's handwriting on these prescriptions, which I turned into the druggist and I had two receipts, and that is all the familiarity I had with his handwriting."

The wife of the witness Hardwicke, testifying for plaintiff, said: "I knew Dr. Joseph F. Meffert in his lifetime, twelve or fourteen years; I knew his brother Charley (the plaintiff) and Charley's wife; I heard some talk of a trade between Dr. Joseph Meffert and his brother Charley, for real estate in Kansas City. I took two or three trips with my sister-in-law to look at places. After we had looked at two or three places, the Doctor said, 'Well, if you want the property I will see that you get it. I owe Charley between thirty-six and thirty-seven hundred dollars on these notes and the trade will more than pay for the property.' I know the handwriting of Dr. Joseph Meffert, the $3674 note dated July 26, 1915, payable to Mary Meffert is in Doctor Meffert's handwriting and so is the note of September 6, 1915, $2000, payable to Mary Meffert, and the $2950 note of November 14, 1901, payable to Chas. Meffert. In my judgment the words 'twenty-nine hundred' are in Dr. Meffert's handwriting, and so is the indorsement. On the $500 note, 1902, the words 'by cash, October 21, 1912 on within note $10' in my opinion, Doctor Meffert wrote those words. In my opinion Dr. Meffert wrote the figures '2-15,' and signed his name on the receipt for $10, December 4, 1915, reading: 'Received from Pipps Taylor, rent 3602 East 15th, till December 1, 1915, Joseph F. Meffert.' I am the wife of Mr. Hardwicke; my husband's sister is Charley Meffert's (the plaintiff's) wife. I have talked with Dr. Meffert; he said he owed Charley some money and would pay it; he said he owed between thirty-six and thirty-

seven hundred dollars, with interest. If they did not get the amount I stated in my testimony at the former trial, that is not my fault. I remember it, because the Doctor said it at my house.'' Cross-examined as to the appearance of the faces of the notes, the witness found no evidence of any erasure or other indications of a change in the note since it was originally written. Witness has had no experience in the matter of handwriting, or the comparison of same.

A Mrs. Baker testified: ''I am the sister of Dr. Joseph and of Charley and William Meffert; I have lived in Liberty practically all my life. I have seen my brother, Dr. Joseph Meffert, sign different papers; I think I know his handwriting. My opinion is that the $2,000 note, payable to the order of Mary Meffert, is in his handwriting. In the last five or six years before his death, I saw him do writing very little. He did not do any writing at our home at all. Only if he wanted a little change from ma, he would make a little note and sign it to her. That is all the writing he ever done— he never gave me a line; I never had any business transactions with him; the only ones I ever saw were some he gave my mother.'' Disclaiming any knowledge of the handwriting of the deceased, other than as indicated, the witness said: ''As far as his name to the notes are concerned, I think he wrote his name. That looks, to my opinion, like his writing in the body of the note, the words 'twenty-nine hundred,' and the figure '2.' Of course, that may be his writing or may not; of course, I can't tell. I didn't see him do it. I don't know whether it is or not. I signed the paper at Mr. Lawson's office, saying I knew nothing about this case. He did not show me the notes. I told him I didn't know anything about the notes. I told him I had not seen the notes. I have not seen enough of the Doctor's handwriting to be able to tell about his signature.'' She could not remember to have heard the Doctor say anything about my indebtedness to his brother Charley.

"I never spoke to him about his business at all. Of course, I know that you know that he owed Charley some money. I can't just remember, it was probably eighteen or nineteen years ago, it was a long time ago since I heard from any source he owed Charley." This was all the evidence for the plaintiff.

The testimony for the defendant, was as follows:

John S. Major, president of the First National Bank of Liberty, testified as follows: "I am in the banking business; I have been for twenty-two years. I was acquainted with Dr. Joseph Meffert in his life time. He was a customer of our bank when I came there in 1897; he had been before, but I don't know how long. He carried an account there up until the time of his death, and I had checks often. I became familiar with his handwriting. It is a part of my business to familiarize myself with handwriting, as an active official of the bank. The indorsements on the back of the two notes, the one for $500, and the other for $2950 are, in my opinion, not in the handwriting of Dr. Meffert. Looking at the word 'hundred,' on the note for $2950, it appears that there has been a line drawn thereon and extended out to the word 'dollars' and the line erased and the word 'Hundred' written over it. There is a character joining the top of the two strokes, forming the letter 'H,' in the word 'Hundred,' that is the same character as the '&' out at the end of it. Also at the end the '100' under the line is printed and the '50' is written over, as '50/100.' If the line was drawn from the 'twenty-nine' it would read 'twenty-nine: fifty.'

"In the $500 note, the '2' figure in 1902, shows to have been written over an erasure. You cannot make out distinctly what is under there; it looks like it might be a '1,' but I am not sure about that, but the '2' has evidently been written over the other, with a different colored ink. One has turned brown and the other, the '2,' in black ink, has not turned brown. The date seems to me to originally have been 1901. There is a payment

'by cash, October 21, 1912, on the note for $10.' I am familiar with Doctor Joseph's signature. That is his signature on this note. Doctor Meffert was a careless man in his way of writing." Having read the face of the $200 note, conceded to be genuine, the witness stated: "This reads 'Two Hundred' with dollars and then interest; very carelessly and loosely drawn. It is plain that the word 'May' was erased and June written over it on this note, and that the handwriting is that of Dr. Meffert, and the 'Two Hundred' is written over the erased word "received," at least, that is what the face of the note indicates. There seems to have been an erasure where the name of 'Charles Meffert' now appears in the note." The witness is here examined at length about the distinguishing differences between the similarity and dissimilarity in the figures appearing on the different notes, as indicative of the amounts of same.

John L. Dougherty, cashier of the Commercial Bank, at Liberty, having occupied that position for fifteen years, testified as follows: "In connection with my business, I have had occasion to give attention to the matter of handwriting and the signatures of people and the identification of their writing. We have to know our customers signatures; naturally we pick up information about handwriting. My position has required me to do that kind of work. I knew Dr. Joseph Meffert all my life, nearly; he did most of his banking business while I was with the Commercial Bank, at the First National, but he did some business with us. I had occasion to see his checks and also to pass on them. At times he had an account in our bank. I am familiar with his handwriting." Shown the two notes, one for $2950 and the other for $500, the witness stated: "that the indorsements on the back of same were not in the handwriting of Dr. Meffert; the signatures seem to be in his writing. On the note for $2950, it looks like the 'Hundred' had been scratched out between twenty-nine and 50/100 dollars, and the space written over. The top stems of the 'H'

seem to have been changed. The 'Hundred' and 'Twenty-nine' is heavier, as would be natural when written over an erasure. It looks very much as though there had been a line drawn there, running from the 'Twenty-nine' to the cents, 50/100, and the 'H' looks like it had been made with two strokes and then afterwards another added. At first glance, if it was by itself, you would not know whether it was intended for an 'H' or not. On the $50C note, it looks to me like the '2' had been erased and written over with a different colored ink." On cross examination, witness stated: "that if he was called on to pay a check for 'Two Thousand, Nine Hundred Fifty' he would not pay it, because there is nothing there to indicate that it is dollars. There is nothing to indicate that there is dollars, except the dollar mark in front of it and that is imperfect. It is not '$29.50' in figures and it ain't '$2950.' There is no symbol or anything to indicate to me what it was. It looks to me like the figures '$2950' are Joseph Meffert's, but I couldn't tell without a good many more of them to compare with it, than I have. I would not say that those figures following the dollar mark '2950' were written by Joseph Meffert, for $2950. This note which you show me as having been made 'o his mother looks like the Doctor's handwriting. I would swear to it as well as I can swear to anything. The word 'Hundred' in the $200 note is written over an erasure. The signature to that note is in his writing. It looks as though the $200 note had been written on some kind of a blank receipt. The Doctor was a slovenly man in making his checks and notes, at times. I knew Dr. Joseph Meffert all my life and I don't know whether he ever drank or not. I think the Doctor wrote the note which you have shown me, to his mother, and also the $200 note. I think he wrote the word 'Hundred' in the $500 note. I don't recall that he ever borrowed money from our bank."

James H. Southwell, director of a Microscopical Pharmacy in Kansas City, testified: "That he had about thirty years experience in this line of work." Shown

Lawson v. Meffert.

$500 note, he stated: "That this note is written in the common ink used, called fluid or as chemists called it, iron nutgall ink, except the figure '2' which is written in common black or logwood ink.  I tested this note in different places, first the figures, then the signature, and found that the '9' and '0' were written in iron nutgall ink, common writing fluid, such as Carter's, Sanford's or Arnold's, while the '2' is written in logwood potassium ink, or common black ink.  These are the two kinds most commonly used for business purposes.  The body of the note and all of the date except the '2' is in one kind, and the '2' is in another kind."  This is followed by a long statement of the witness as to the constituent elements of the different kinds of ink and the test used in determining their nature.  Continuing, the witness said: "I put the $2950 note through these tests.  I found that it was entirely written in one kind of ink and examined the word 'Hundred' microscopically, and found a line of erasure that ran from a little this side of the '&' to nearly the end of the 'u' upon the paper.  This examination disclosed that the paper fiber was disturbed and that it ran over to the '50/100.' "  The witness demonstrated the manner in which the erasure was disclosed, by illuminating the same under an electric light.  Following this exhibition, the witness said: "Well, you can see at the end of the 'd' there, that the erasure or disturbing of the paper runs up to the 'd' and beyond.  The paper is scored or picked into a little bit where the erasure was made.  By moving the paper along here, you can see, it shows plainly.  The erasure I find is discernible up to the first part of the 'u', and from there on clear on before the small 'r' in the word 'Hundred.'  I have had a great deal of experience in the matter of examining handwriting in one way or another.  I have made a study of this subject.  I think these indorsements were written by the same person.  It seems as though they were done by a writer, more or less expert than the person who did the writing on the face of the

notes. I discover no common characteristics between the
writing on the faces of the notes and the two indorse-
ments, but the latter have the same characteristics.''
Further dissimilarities between the writing on the faces
of the notes and the indorsements 'were brought out on
cross-examination, as well as points of difference not nec-
essary to be detailed here.

Anna Meffert, daughter of the deceased, testified
as follows: ''I was present at the time of my father's
death, in 1916. I was not living with him at the time,
but was with him from Sunday until after he died on
Wednesday. There was in his house when I went there
and until his death; the housekeeper, and 'Mrs. Charles
Meffert was out there part of the time; a nurse was
with him all the time. When I saw my father on Sunday,
before his death, he was very low and seemed to recog-
nize me a little; he kind a smiled, but was not able to
talk. I don't remember of his saying anything to me.
I walked up to him and took hold of his hand and he
just pressed mine and I could tell from the way he was
acting that he knew who I was. He seemed to be in
rather a dazed condition, and he was lying with his
eyes closed; he was conscious on Monday and a little
conscious on Tuesday, but after Tuesday evening he
did not seem to know anything. On Tuesday night I
went out to Mrs. Baker's and stayed all night. Wednes-
day morning, as soon as I could come back, I went to his
sick room and was there until he died. I may have gone
out to lunch, I don't remember; I may have gone into the
dining room now and then and came back after lunch
and came back and sat there before he died and when
the nurse came into the kitchen and told us he was dying.
During the last day, Wednesday, he did not converse
with anyone; he was not conscious; I was present along
from early in the morning until when I just stepped
out. If my uncle, Dr. William Meffert, from Emporia,
had any conversation with him that morning about
notes, I did not see him and did not hear him. He was

there on Wednesday afternoon and I think it was then he went in there; I was there sitting in the room and he wanted father to take some nourishment; he was lying at the time in a semi-conscious condition—I don't know whether it was a stupor or not. He did not open his eyes or say anything. They put something into his mouth, and Dr. William Meffert took his face and patted it and said, 'Swallow, swallow, swallow.' That was all, there was no response on my father's part.'' Cross-examined, she said her father was about 59 years of age, and that he left her the greater part of his property in his will. Portions of the will were then read over to the witness. ''I cannot say what the relationship was, or had been between my father and his brother William as manifested when the latter came to my father's bedside, because he was unconscious. I cannot say that it was friendly; I am sure that he was unconscious from Tuesday evening on. I was in the room off and on.''

C. W. Ransom, author of a system of penmanship in different forms, for thirty years, testified: ''I have written text-books on the subject, and have had occasion to examine handwriting and disputed documents for the purpose of ascertaining the genuineness of the writing. I have made a study of that matter. I have examined these two notes, one for 'twenty-nine hundred dollars' in writing and '$2950' in figures, and one for '$500' in figures, and I have had an opportunity to examine these writings you hand me and which are marked as exhibits in this case. In my opinion, the indorsement on the back of the note for $500, to-wit, 'By cash, October 12, 1912, on within note $10', is not in the handwriting of the party who wrote the face of the note, excluding the date there or the '2' in said date. The indorsement on the note for $2950 is, in my opinion, not in the handwriting of the party who wrote the face and body of that note and the signature.'' Witness then explains his reasons for that conclusion, based upon the manner in which the writing

was done and the formation of the letters.   Taking the
$500 note, the witness stated: "that it was very evident
that underneath the '2' in the date 1902, there had been
an erasure."   The reasons for this conclusion are also
given, not necessary to be detailed.   Continuing, the wit-
ness said: "It looks very much like the 'twenty-nine'
in this note for $2950 was written, but the '&' was made
and then a straight line extended to the '50' and then
this line was erased.  This erasure seems to have been
made clear across and right over the top of the 'Hundred'
and the loop or the top of the uprights of the 'H' are the
remnants of the old '&.' "   Cross-examined, the witness
said: " I understand that all the signatures are admitted
to be genuine on these different notes.   I think I could
pretty definitely determine whether the handwriting was
that of Joseph Meffert."   The witness then proceeds to
define the distinguishing characteristics between the dif-
ferent writings on these notes.   The conclusion being that
the changes made were not in the handwriting of Dr.
Joseph Meffert, or more correctly perhaps, that the signa-
tures and the other writings on the notes were not by
the same person who made the erasures and the changes.
On re-direct examination, the witness stated "that the
$200 note was apparently written on a piece of paper that
had theretofore been used for something else and was
dated 'May 1st' with an indelible pencil."   What are
called the characteristics of handwriting were explained,
and while they were stated to vary in some degree, ac-
cording to the position of the writer and the conditions
under which they were written, the characteristics would
be the same.

Martin E. Lawson, testifying on behalf of the de-
fendant, said: "I live in Liberty; I am the administrator
of Dr. Meffert's will.   I had known him about twenty-five
or twenty-six years before his death, and had acted as
his attorney for twenty-one or twenty-two years.   He
was in my office on an average of once a month during
that time.  Frequently he was there twice a week, often-

times I would have him sign deeds, contracts or papers, and he would sit down and make some rough sketch of agreement he was about to make with someone, for me to put in legal form. I have seen him write a great many times and have had his handwriting before me frequently. I had seen the note dated June 8, 1913, payable to Charles Meffert, for $200, before the Doctor's death. My recollection is I saw it before it was delivered to Charles Meffert. I first saw these two notes, one, Twenty-Nine Hundred Dollars, in writing, $29.50, and the $500 note, the two that are in controversy in this case, shortly before the Doctor's death. Sometime after his death, Charley Meffert and his wife brought the notes to my office. I then saw the indorsements or credits on the backs. From my experience and acquaintanceship with the Doctor's handwriting and having seen him write, I am of the opinion that these indorsements were not written by him. I formed that opinion when I first saw the notes and took them to his banker, Mr. Major, that same day. At the time this suit was instituted and after these notes were brought to me and my suspicions were aroused about them, I took a statement to Mrs. Baker and Mrs. Meffert, the mother and sister, and asked what they knew about it. I took their statements in writing, Mrs. Baker signed it and Mrs. Meffert, who was blind, made her mark.''

Cross-examined, the witness said: ''I do not attempt to account for the slovenly or careless way in which the $200 note is written. The Doctor had a way of picking up most any sort of paper and writing on it. I notice this note is written on a receipt blank. I don't know anything about his writing, rubbing out and writing over it. He was careless in the formation of letters; he did not form his letters fully and completely at all times. I never saw him rub out and write over anything. This note looks like he started, or somebody started, to write the word 'Received' here and this had been rubbed out and the note written over the top of it. It is written on a loose piece of paper.'' The witness then explains the conditions

under which the $200 note, conceded to be genuine, was made by the deceased to his brother, the plaintiff.

This was all of the evidence.

The setting forth at length of the relevant testimony of the witnesses for the respective parties is not deemed inappropriate to assist in determining the greater credence which should be given to their testimony if, in its examination, the rule is kept in mind as to the province of the jury where there is substantial evidence to sustain any issue. In no other way than by a presentation of the testimony of witnesses in their own words can the same be weighed and measured so as to satisfactorily determine its probative force. In the application of this test, the intelligence, experience and familiarity with the matter in controversy and the interest or lack of interest of the witnesses in the result of the action, may be fairly taken into consideration.

The payment of the notes in controversy is contested: (1) on the ground that they have been paid; (2) that they are barred by the Statute of Limitations; (3) that they are void because of material alterations; and (4) that the credits on the backs of same are not in the handwriting of the alleged maker.

I.   Other than by implication, there is nothing to sustain the contention that the notes have been paid. The facts, not disputed, are that Joseph F. Meffert, in addition to being actively engaged in the practise of medicine, made money in dealing in real estate, in which transactions he had continuous dealings with local banks. These facts lend persuasive coloring to the conclusion that while thus engaged, it would be rather singular that he should not only borrow, but retain without any payments thereon, for almost ten years, the amounts of these notes, from a brother not shown to have been possessed of any considerable means, who combined the modest vocations of a barber with that of a druggist in a small town in Kansas. In the face of these facts, the

*Payment.*

impartial mind which draws its conclusion from the known and well recognized conduct of men under like circumstances might reasonably hesitate to give ready credence to the creation of these debts. If created, however, no substantial proof has been adduced as to their having been paid.

II. A more serious question confronts us in the contention as to the bar of the Statute of Limitations. On the back of the note for $2950, there appears a credit or the indorsement of a payment for $50; dated October 24, 1911, which was twenty days before the note would have been barred by the statute. On the back of the note for $500 there appears a credit or the indorsement of a payment of $10, dated October 21, 1912, or twenty-three days before this note would have been barred by the statute. Waiving the rather unusual circumstances that these notes were made by a business man, who, judging from his pecuniary successes or superior acquisitive ability, must have realized the importance and be reasonably held to have pursued the course of promptly meeting his obligations, it is rather unusual, to say the least, that he would borrow these small amounts from a brother, who is not shown to have had any money, and thereafter completely ignore the obligations thus incurred, for almost the entire legal life of the debts and then make these nominal payments in the manner in which their entry upon the backs of the notes indicate that they were made.

However, the absence of proof as to these payments having been made other than their entry on the backs of the notes is the matter with which we are primarily concerned. Aside from the opinions of certain of the witnesses for the plaintiff, shown to have been non-experts, that the handwriting of these entries of payments was the same as that of the signatures of the payer or the alleged maker of the notes, there was no evidence offered on this subject.

*Limitations: Indorsements.*

Lawson v. Meffert.

It is the well settled law of the State that there is no presumption that an indorsement of a payment on a promissory note was made at the time it bears date, and to remove the bar of the Statute of Limitations it is necessary to adduce in evidence other proof than the mere production of the note with a credit thereon, bearing a date which would have that effect. A contrary rule was announced in Carter v. Carter, 44 Mo. 195, and in Smith v. Ferry, 69 Mo. 142, to the effect that in indorsements of payments on promissory notes, it is presumed that they were made at the time they bear date; but these rulings, as shown by later cases, do not correctly declare the law, in that it is now held to be necessary, in order to remove the bar of the statute, to show that the credit was actually made by the owner of the note, or by his direction at a time when the note was not barred by the statute, or, by more direct evidence, that the payment was actually made by the maker at such time. If it be shown that the credit was indorsed on the note by the holder at a time when the same was not barred and was, consequently, against his interests to have made it, this will furnish prima-facie proof that payment was made at that time and in the absence of a showing to the contrary the note will not be barred, but in such cases there must be proof that the credit was, in fact, made at such time. There was no such showing. Aside from mere opinion evidence as to a similarity in handwriting, which was subjected to serious question by strong counter proof, no effort was made by the plaintiff to support the claim that these payments were made when dated or at any other time. If the rule regulating this matter were otherwise, ample opportunity would be afforded for fraud, in that the holder of a note would have it in his power to toll the running of the statute by simple dating a payment prior to the bar, especially where, as in the instant case, death had closed the mouth of the maker. The countenancing of payments so entered without proof, would result in destroying the rule heretofore recognized, that

payments antedating the bar of the statute are held to be against the holder's interest, in that an antedated entry of payment would redound to his interest. Hence, the wisdom of the requirement that there must be proof *aliunde* of such payments.

In Phillips v. Mahan, 52 Mo. 197, it is held that an indorsement of partial payment made on a note by the holder without the privity of the maker is not of itself sufficient evidence of a payment to repel a defense created by the Statute of Limitations.

In Goddard v. Williamson's Admr., 72 Mo. 131, it is held that when the Statute of Limitations is relied on as a defense to a note, the plaintiff should not be permitted to read in evidence credits indorsed on the note without first proving when the indorsements were made.

In Regan v. Williams, 185 Mo. l. c. 631, it is held that it is not the indorsement of a credit, but the payment that operates as a renewal of a promise and removes the bar of the Statute of Limitations; that the party relying on a payment to stop the statute must not only establish that it was made, but that it was made by the authority of the defendant; that a part payment does not take a debt out of the statute unless made under such circumstances as to warrant the inference that the debtor thereby recognized the debt and signified his willingness to pay it.

In Zaring v. Bauman, 223 S. W. (Mo. App.) 947, in which the facts disclosed that the holder of a note had indorsed payment thereon before the note was due, it is held that the mere indorsement of a credit on a note does not prove that such credit was entered before the note was barred, but there must be evidence *aliunde* of the indorsement of such payment to show that it was in fact indorsed as a credit before the note was barred.

In Berryman v. Becker, 173 Mo. App. 346, it is held that where there is proof that a credit was indorsed on a note by a holder at a time when it was not barred, this being against his interest, is prima-facie evidence

that payment was made at that time, and, in the absence of any showing to the contrary, the note will not be barred, but where there is no evidence *aliunde* as to when the credit was indorsed, there must be proof that the payment was, in fact, made.

III. The testimony of chemical and handwriting experts was to the effect that erasures had been made on the faces of the notes; that same was indicated by the scratched or roughened condition of the paper and that the ink used at the points of erasure was different in composition and color from that used elsewhere on the notes.

Alterations.

The ancient rule of evidence, as stated and discussed by Mr. Greenleaf (1 Gr. Ev., sec. 564), was that alterations and erasures of written instruments were presumed to have been made at or prior to the time of their execution. The trend of authority is still in favor of the rule as thus declared. However, where an alteration or erasure appears suspicious on its face; for example, where a different ink has been employed at the point of erasure from that elsewhere used in the instrument, it demands explanation. In the presence of this, or equally cogent circumstances of a suspicious nature, the law presumes nothing and the question as to the time when, the person by whom, or the interest for which, the alteration was made, are matters of fact to be found by the jury upon proof adduced by the party offering the instrument in evidence.

Commissioner RAILEY, in Collison v. Norman, 191 S. W. 60, with commendable care, has recently discussed the question here under consideration and has reached the conclusion above indicated, supported by a wealth of authority from our own and other courts. The erasures here testified to by experts as having been made, were, in one instance, such as to change the sum payable; in the other, to change the date. Such changes are classified by our statute as material alterations. [Sec. 911, R. S. 1919.] As such, they should have been explained.

[Mech. Am. Nat. Bank v. Helmbacher, 201 S. W. (Mo. App.) 383.]

We have heretofore discussed the question as to whether or not there was any evidence that the indorsement of the payments on the notes was in the handwriting of the deceased.

IV. Error was committed in the admission in evidence, without more, of the testimony of a brother of the deceased as to a statement alleged to have been made by the latter when under all the attendant facts and circumstances he was *in extremis*. This statement was as follows: "I have fixed his notes, and he will get his money." In the absence of evidence connecting this statement with the notes in controversy, or an identification in some manner of the person referred to, this statement, under the most elementary rules of evidence, was inadmissible. Its admission, unexplained, was irrelevant and could only have been prejudicial to the defendant.

*Admission: In Extremis.*

For the reasons stated, this cause will have to be reversed and remanded. In the absence, upon a re-trial, of more substantial proof than has heretofore been adduced, a judgment for plaintiff cannot be sustained.

All concur.