GROVER W. LAMPE, Claimant and Appellee, v. FRANKLIN AMERICAN TRUST COMPANY and MARY BIRKENBACK, Executors of the Last Will and Testament of MILTON W. BIRKENBACK, Defendants and Appellants.—96 S. W. (2d) 710.

Division One, September 8, 1936.

*Sam M. Wear, Herman Pufahl* and *W. D. Tatlow* for appellants.

*Frank B. Williams, A. P. Stone, Jr., R. Jasper Smith* and *Douglas & Douglas* for appellee.

HYDE, C.—This is a proceeding to establish a $9900 note as a demand against the estate of M. W. Birkenback, deceased. The defense thereto was a denial of the execution and delivery of the note sued on; a denial of any indebtedness to plaintiff; and a denial that Birkenback received the amount of the note or any other consideration therefor from plaintiff. Defendants' claim was that material alterations had been made in a note signed by both plaintiff and deceased for some other purpose. The Probate Court of Greene County after hearing allowed the full amount of plaintiff's claim. On appeal to the circuit court of that county, there was a verdict and judgment against plaintiff. Thereafter, that court granted plaintiff a new trial and, on change of venue, the case was sent to Polk County. At the first trial there, the jury disagreed and no verdict was reached. At the second trial, plaintiff had a verdict for $13,619.55. From the judgment entered thereon, defendants have appealed.

Plaintiff's claim is based on the following note. (It is admitted that the italicized words and figures were written by Birkenback. Plaintiff claims that he wrote the words in parenthesis. The remainder was part of a printed form. The numbers in parenthesis show the place of beginning of each of the first ten lines of the note.)

"(1) *$9,900.00*                    Springfield, Mo. *Jan. 24, 1930.*

"(2)   *Thirty days* after date *we* promise to pay to the order of (3) the (G. W. Lampe) at the office of *Lampe-Birkenback Co.*, in the City of Springfield, Missouri, (4) *nine thousand, nine hundred and no/100* dollars (5) for value received, negotiable and payable without defalcation or discount, with interest from *date* (6) at the rate of *8* per centum per annum, *we* having deposited or pledged with (7) (G. W. Lampe) as collateral security for the payment of this note (8) and any other indebtedness, whether as principal debtor or otherwise, due to the holder hereof: (9) *Our ownership in the Lampe-Birkenback Co.* (10) *of Springfield, Mo.*

"Collaterals in their possession now, or hereafter, or any substitutes therefor. (Here follows the printed form collateral agreement which is not material to any issue herein and is therefore omitted.)

"Each of the makers hereof, and the endorsers hereon, waive demand, notice, and protest on this note. And if this note is not paid at maturity, we further agree to pay all costs of collection, including ten per cent additional as attorney's fee if this note is placed in the hands of an attorney for collection.

*"M. W. Birkenback."*

Below the letters *"ken"* in this signature can be seen the outline of the letters "pe" and there are remains of lines extending into the initials "M.W.B." The paper is also thinner in some spots under this signature than elsewhere and there is also a large ink spot or blot, most of which is below the second signature line. The word *"our"* in the ninth line has a partial loop extending below the letter "r" into the letter "S" of the word "Springfield" in the line below, which was written with different ink. According to defendants' evidence, this word *"our"* was read as "my" by plaintiff's brother when he testified in the first trial in the circuit court. It was written "my" in the copy of the note attached to the original claim filed by plaintiff in the probate court.

In the printed form the "Union National Bank" appeared both as the payee and as the place of payment, printed in larger and blacker capital letters than was used for other words in the line where they appeared. These words had a single ink line drawn through them, where they were used in the center of the third line of the note to state the place of payment, and the words *Lampe-Birkenback Co.* were written *under* them. Where they were used at the left of the same line to designate the payee, they were completely covered over by many marks of a pen, and the name (G. W. Lampe) as payee is written *above* them. The inked over space extends below these words and it is defendant's contention that they cover also the name of some other payee written *under* them by Birkenback. There is some kind of a mark extending down from the left side of the inked space thereunder. Some of the letters of plaintiff's name, where it had been also written *below* these words, extend below this inked space and into the letters of the words *Nine Thousand* written by Birkenback to state the amount of the note in the fourth line thereof. Plaintiff's name (partly marked out) *below* the inked out words is in different colored ink from that used in writing (G. W. Lampe) *above* them. In fact, the color of ink used in writing his name as payee does not appear anywhere else on the note, except that it may have been used in marking out the words "Union National Bank" where used to designate the payee and in inking over the space below them. Defendants' evidence was that a blue pencil was also used in this obliteration. Where the name (G. W. Lampe) appears in the seventh line of the note as pledgee of the collateral security, it is in ink of a different color from that used by Birkenback in writing the rest of the note and also of a different color from that used in writing (G. W. Lampe) as payee above the third line.

Defendants had expert testimony to show that there were three different inks used on the note; that two other persons besides Birkenback had written thereon; and that chemical ink remover had been used on the note in the seventh line and also on the line under the

signature of Birkenback. There are distinct yellowish spots at both places and these parts of the note show the appearance of something having been rubbed over the paper. Defendant also had evidence that such ink remover had been used in the inked over space under the place where the words ''Union National Bank'' appeared as payee in the printed form; that this had obliterated the original top of the letter ''T'' in ''Thousand'' in the line below; and that it had been replaced with different ink. There are a number of small ink spots on the face of the note mostly on the lower half thereof. There are several folds in the note along some of which there are holes through the paper. Defendants' expert evidence was that Birkenback's writing on the note was done before it was folded; that plaintiff's brother wrote plaintiff's name in the seventh line and under the printed name of the payee; that plaintiff had written his name above the printed name of the payee; that each had used different ink from that used by Birkenback; and that plaintiff's name in all three places was written after the note had been folded.

Defendants claim that their demurrer to the evidence at the close of the case should have been sustained. This requires a full statement of the facts which were shown by plaintiff's evidence. However, before making such a statement it is first necessary to decide whether plaintiff was competent as a witness, because plaintiff was permitted to testify on the theory that his incompetency under Section 1723, Revised Statutes 1929, had been waived. The waiver is claimed because of plaintiff's cross-examination in the probate court. L. J. Lampe, plaintiff's brother, had filed a claim against the Birkenback estate for services rendered in connection with the promotion of the Birkenback garage building. Plaintiff testified therein as a witness for his brother, and on cross-examination he was asked if and admitted that he had filed a claim for $9900, against the same estate, and that his brother was the witness who testified for him to establish it. He was then further cross-examined about his own claim and in answer to questions asked him said that he sold his interest in the new garage property to Birkenback ''for a note of $9900; that this property was then already in Birkenback's name; that it was never in his name; that part of the consideration of the note was for his interest in the land; that the consideration ''was money loaned to Mr. Birkenback;'' that he ''loaned him money to buy this land;'' that ''some of it was for back interest and some other things;'' that he had ''forgotten those figures'' so could not tell ''how much was for back interest and how much for something else;'' that he could ''get those figures;'' that he did not know how to figure how much interest he had in the land; that he could give approximate figures as about $5400 in the land and about $4000 as his interest in the building; that it was about $9000 that he had in the building and in the land;

that the $4000 in the building was "all cash no interest in that;" that he "would say $4,200.00;" that he had "one check for $4,250.00" advanced to Birkenback; that it was on the Holland Banking Company; that he would produce it; that he advanced cash besides this check; but that he did not have those figures with him; and that he "couldn't tell from memory" how much cash but would have to consult his figures. Several objections were made and overruled to this cross-examination.

When plaintiff's case was tried in the Circuit Court of Greene County the transcript of this cross-examination "was introduced by defendants and received in evidence." Plaintiff failed to recover in that trial but the court granted him a new trial, upon the following ground:

"Because the court erred in holding that plaintiff, G. W. Lampe, was incompetent to testify as to any fact occurring prior to the filing and probate of the will of the deceased, M. W. Birkenback, and in refusing to permit the plaintiff, G. W. Lampe, to testify to any fact relating to or in connection with the execution and delivery to him of the note sued on herein, although defendants had waived the incompetency of the testimony of the plaintiff and made his testimony competent by introducing in evidence a transcript of the testimony of the plaintiff in the claim of J. L. Lampe against the estate of M. W. Birkenback, wherein defendants had examined and caused plaintiff to testify as to the facts relating to the execution of the note in question and the consideration therefor, and other facts occurring prior to the filing and probate of the will of M. W. Birkenback."

Defendants insist that there was no waiver by them; that it was reversible error to permit him to testify; and that without his testimony no case was made for the jury. The common-law interest rule excluded as witnesses not only parties to the suit but also all other interested persons. [See 1 Wigmore on Evidence, 985, secs. 575, 577.] In this State the disqualification of interest was first removed as to witnesses but retained as to parties. [Chap. 168, pp. 1576-1578, R. S. 1855.] Not long thereafter the disqualification was also removed as to parties. [Sec. 1, Chap. 144, p. 586, R. S. 1865, now Sec. 1723, R. S. 1929, having been amended Laws 1887, p. 287.] In removing this disqualification, as was the case in most states, "an exception was carved out of the old disqualification and was allowed to perpetuate within a limited scope the principle of the discarded rule." [Wigmore, sec. 578.] It has been said "that our statute was 'purely remedial in its nature, its object being to remove a disability which theretofore existed at common law, and that the proviso creates no disability, but only limits the operation of the enabling provision;' that it is 'a qualifying, and not a disqualifying, statute;' and that it is not the usual interest of a witness as a party to the suit which

disqualifies him, but it is his 'interest as the only surviving party' to the suit, which because of this circumstance, is assumed to be an exceptional interest.'' It has also been said: ''That the spirit of the statute as well as its letter must be considered; that it is intended to prevent injustice which would result from the advantage one party would have if permitted to testify without fear of contradiction; that to accomplish this purpose whenever the lips of one person, who knows about a matter in issue, were sealed by death, the lips of the other must be sealed by law; and that it is a disqualifying as well as a qualifying statute.'' [See Freeman v. Berberich, 332 Mo. 831, 60 S. W. (2d) 393.] As shown there, some basis exists for both views. Nevertheless, whether its main purpose was to remove disqualifications or to create equality and prevent false swearing, it is clear that the disqualification provided for was intended as a shield for protection of those claiming under a deceased party and not as a sword for attack upon a living party's interests. Therefore, it has been almost invariably held that, since the personal representative of a deceased party, suing or defending, may require the disqualified party to testify, if he does call him ''and examines him in regard to transactions with the decedent, he thereby waives the statutory incompetency of the witness, making him competent as a general witness in the case.'' [28 R. C. L. 514-516, secs. 102-103; 70 C. J. 372-374, secs. 490-491; 64 A. L. R. 1148, note; Morley v. Prendiville, 316 Mo. 1094, 295 S. W. 563.; In re Trautmann's Estate, 300 Mo. 314, 254 S. W. 286; Hodge v. St. Louis Union Trust Co. (Mo.), 261 S. W. 67; Rice v. Waddill, 168 Mo. 99, 67 S. W. 605; In re Soulard's Estate, 141 Mo. 642, 43 S. W. 617; Borgess Inv. Co. v. Vette, 142 Mo. 560, 44 S. W. 754; Ess v. Griffith, 139 Mo. 322, 40 S. W. 930; Hattersley B. & C. Co. v. Humes, 193 Mo. App. 120, 182 S. W. 93; Tierney v. Hannon's Executor, 81 Mo. App. 488.]

Does not the use of a transcript of an examination (about the transaction in issue) of a party against him in his trial amount to the same thing as calling such party to the witness stand therein, asking him the same questions, and eliciting the same answers? Especially is there not good reason to so hold when the questions in the transcript were asked by the same attorneys representing in both cases the same defendants? We are not here called upon to decide whether the competency of plaintiff to testify in his own case was waived merely by his cross-examination, in his brother's case, about matters in no way material in that case, but which did serve the purpose of finding out what plaintiff claimed to be the consideration for his own note. About that we express no opinion, because defendants used plaintiff's cross-examination against him in his own case by offering it in evidence therein. We think that the Court of Appeals of New York, in Cole v. Sweet, 80 N. E. 355, affirming 98 N. Y. Supp. 625, correctly

reasoned such a situation. [For a case to the contrary see Merchants' Loan & Trust Co. v. Egan (Ill.), 78 N. E. 800.] The Cole case was a suit brought by an executor at the instance of a residuary legatee against the defendant for an accounting. The executor introduced, in that suit, the defendant's evidence taken before a Surrogate on exceptions by the residuary legatee to the executor's failure to recover certain alleged claims against defendant. Defendant had been examined as a witness on behalf of the residuary legatee, in that proceeding, which afterwards was suspended by the Surrogate because he deemed himself without jurisdiction.

The court there said:

"The point would not be open to discussion if the defendant had been sworn in this action in behalf of the plaintiff; but there is no substantial difference between such a situation and the one before us, where the testimony of the defendant taken in another proceeding at the instance of the real plaintiff herein was read in evidence *in extenso*. Equality cannot be preserved, nor unfair advantage prevented, if a party is allowed to do indirectly that which he could not do directly. We think, as was said by the learned Appellate Division, 'that the plaintiff, under the circumstances presented here, by reading the defendant's testimony given in the Surrogate's Court in evidence as a part of his case on this trial, is in no different position than if he had called the defendant to the stand as his witness and elicited from her the same testimony which she had given in the Surrogate's Court. The evident purpose in not calling her was to prevent her from giving on cross-examination the testimony now objected to by the plaintiff. . . . The plaintiff, by the course adopted in getting her testimony, has ' . . . clearly opened the door to the defendant to tell the whole of any transaction about which she had been partially examined.' "

Defendants contend that even if they waived the right to object to plaintiff as a witness to the consideration of the note (which they asked about in the probate court), this did not make him competent to testify about the alterations in the note, because he was not questioned there about that. However, consideration, execution, delivery, and alteration, all went to the validity of the same note, were essential facts to be determined in deciding whether plaintiff could enforce this note, and entered into and were a part of the transaction with Birkenback upon which plaintiff's claim is based. This court said in the Trautmann case: "The disqualification imposed by the statute is for the benefit of him who stands in the place of the deceased party, or whose rights are derived through him, he may waive it and require the surviving party to testify as a witness in his behalf. In doing so, however, he may not limit his waiver. He cannot so restrain the competency of the witness that the latter can only testify

to such subject-matter and under such circumstances as will be beneficial to him. His waiver will be deemed to be for all purposes; otherwise, the statute itself would become an instrument of injustice.'' It is true that in some cases the construction of the effect of a waiver is narrower than this, but they are decidedly in the minority. [See note 64 L. R. A. 1148.] Defendants cite Meffert v. Lawson, 315 Mo. 1091, 287 S. W. 610, but the former cross-examination in that case did not touch the transaction with the deceased, which was in issue. We hold that it is not the particular act or circumstance asked about to which the waiver extends, but it is the whole transaction which such act or circumstance entered into or of which it formed a part. In other words, the waiver goes to the whole transaction inquired into and cannot be limited to any particular part of it. We, therefore, hold that, *by offering plaintiff's former testimony* (about the transaction here at issue) *as evidence in this case*, at the first trial thereof, defendants have waived his competency herein as a witness as to the whole of the transaction between himself and Birkenback concerning the note upon which he bases his claim.

Plaintiff's own version of the transaction begins with the fact that he and Birkenback had been in business as a partnership since 1924 under the name Lampe-Birkenback Tire Company. After Birkenback's death plaintiff received $4500 from his executors for his interest in this partnership, so that this did not enter into the note transaction. But in November, 1928, Birkenback and plaintiff were considering an expansion of their business and they made a written offer to purchase a lot in Springfield for $43,000 with the intention to erect a modern garage building thereon. Their offer was accepted by the owners of the lot and the garage was built in 1929. The whole purchase price of the lot was borrowed from the Miller Rubber Company. The building was financed by a first mortgage of $118,000 to a St. Louis Company. The lot was conveyed to Birkenback and he and his wife signed the notes and mortgage. Plaintiff, however, signed a guaranty of these notes. He said: ''At the time we started upon the erection of the building, I was a partner of Milton Birkenback, a partner also in the erection of the building . . . the contract with the architect was signed to both Birk and myself.'' Plaintiff and his wife, also in June, 1929, signed and acknowledged a quitclaim deed to Birkenback for this property. This deed was not recorded until 1933. Birkenback died in 1931. Plaintiff said that he advanced money to Birkenback ''to complete the construction of that building, in the form of liberty bonds.'' He said that these bonds were ''accumulated by saving my money and buying them;'' that he ''turned over a little less than five thousand dollars in liberty bonds to my partner to be used in the building or erecting of the five-story garage;'' that ''they were turned over at different times;'' that each

time he "got a signed receipt from him," which "showed the date and number of the bonds;" that "the money from the sale of these liberty bonds was deposited in the Union National Bank to a separate fund for handling the promotion and expense of the building;" that this was a part of the consideration of the $9900 note; and that "those receipts were turned over to Mr. Birkenback at the time the new note was made out." He said that the $9900 note was also given to take up a note of $4250 and eight per cent accrued interest. He produced a check to Birkenback dated in 1921 for that amount (before they became partners) drawn on the Holland Banking Company. He said this was the consideration for the original note, which he turned over to Birkenback when the $9900 note was made. He also said that, when he let Birkenback have this money, "he was trying to purchase the controlling stock in a utility plant near Jackson, Mississippi." Plaintiff on cross-examination said that he purchased the liberty bonds from his brother-in-law at various times with currency which he saved "out of the profits of the business" and kept in a safe at his father's home. Plaintiff also said he had "quite a few" discussions with Birkenback about selling him his interest in the building and being repaid the money he put in it "over a period (of) several months." It is not shown that any definite agreement was reached about this before the day the note was made.

■ Concerning the actual making of the note plaintiff said that it was made at Birkenback's desk in the office of the new garage, on a printed form, which he "got in January, 1930, about thirty days before it was executed, and . . . kept it folded in my pocketbook . . . kept it there all the time." Plaintiff said that the form "came from the Union National Bank." He did not say he got it because of his negotiations with his partner about the money he had put in the building and the money he had advanced to him. Plaintiff's wife said that before she signed the quitclaim deed Birkenback said to her: " 'I am going to send a deed out for you to sign,' says, 'It won't be recorded until Mr. Lampe and I have settled,' said 'Until Grove and I have settled on the building.' " Plaintiff said that on the date the note was signed he and Birkenback figured interest on the old note and the liberty bond receipts and that he called in his brother L. J. Lampe who was employed by the company to check the figures. Plaintiff said: "We arrived at a sum of $9,932.60, some odd cents, and the amount agreed upon, settled upon, was $9,900.00, and we just made it even money, and made out a note for that amount." Plaintiff's brother corroborated plaintiff and said that he saw Birkenback write out and sign a note; saw him hand it to plaintiff and heard him tell him "he could fill in his or his wife's name or however he wanted." He said that he then left the office and that there was no other signature on the note at that time but that when Birkenback

handed plaintiff the note he started to write something, but that he did not know "what it was he started to write or what or where he started to write." He also said that he saw the old note for $4250 and figured the interest on it at eight per cent. Plaintiff said that he wrote his own name on the seventh line (stating to whom the collateral was pledged) with an old steel pen and ink that was on the desk; that he then wrote his name with the same pen and ink as payee under the words "Union National Bank," but that "the pen hung when he was writing and blotted." He said that he then blotted out his name and the words "Union National Bank" with the penpoint, took out his fountain pen and wrote his name above the blotted space.

Plaintiff's explanation of the writing of the name of another maker and erasure thereof under the signature of Birkenback on the note was as follows:

"Q. I want you to explain to the jury how you happened to do that erasing there; when you erased it, what were you doing? A. Birk' was to have his wife sign the note jointly with him. . . . Q. All right, go ahead. A. And then a little bit after that he changed his mind and said, 'Why don't you put the name of the Company in there, and not take it over and have the wife sign it?,' and I said 'That will be all right,' and I wrote the word Lampe in there, and then I thought—this is not a company obligation, the company don't owe me anything, and I took an eraser, an old typewriter eraser, and erased that out. Q. Was he there at the time? A. Yes, sir. Q. What did you say to him? A. I told him it wasn't a company obligation. Q. Did he make any objection to it at all? A. No, sir. Q. Was that erasure made right there before him at the time? A. Right before him, yes, sir. . . . Q. At the time the note was being prepared—it was all prepared at one time? A. Yes, sir. Q. Who was to sign the note at that time? A. Well, he was. Q. Just he? A. Yes, sir, Mrs. Birkenback wasn't there. Q. Well, wasn't she to sign it? A. He said she would; he told me on previous occasions that she would sign. Q. What did he say at that particular time, the time the note was being executed? A. He asked me why didn't I put the company's name on it. Q. What did you say? A. I said, 'That will be all right.' Q. He said, 'Let's put the company's name on it?' A. Yes, sir. Q. And you said, 'That will be all right?' A. Yes, sir. . . . Q. The note wasn't to be fully executed until she signed it? A. I don't know how you would figure that . . . . he said she would sign it, but he would rather she wouldn't, because he thought he could get the money to refinance, and Mrs. Birkenback wouldn't have to worry about it. . . . Q. Before the Probate Court, you say in one place that the consideration for that note was the sale of your interest in the property, and in another place you say it was for money loaned; isn't that right? A. Well, it was money

put in the partnership, for the building. . . . Q. If part of that note was given for your interest in the land and building, why was it that you executed a deed to Mr. Birkenback six or seven months before that note was given? A. We talked about this settlement, and I think the way that come up, the Guaranty Title and Trust Company requested a quitclaim deed; the deed was in his name. . . . Q. And you had no interest in it at all? A. In what? Q. In the building? A. Sure I did."

Plaintiff also had as a witness an attorney who said that plaintiff and Birkenback talked to him about a note together. He could not remember the amount nor identify it as the note in suit. He said that they inquired whether it was necessary for Birkenback's wife to sign it. He said he told them that "depended on the shape the title was in . . . if the real estate was in both of their names that both ought to sign the note." He said that the conversation was in the office in the garage building; that Birkenback was "the one that had the note;" that he "brought the paper out of his drawer;" and that he thought the only signature on it was Birkenback's. Plaintiff also had a witness who was in the loan business who said that plaintiff and Birkenback came to his office in February, 1930, to see if his company would buy the note. He said that they told him "the size of the note was $10,000;" that he "had bought notes from them in connection with the tire business;" that "because of the size of the note" he could not handle it; that he did not examine the note carefully; and that it was plaintiff who had the note. He said: "I told them it would be necessary to get Mrs. Birkenback on the note before they could interest any one, and Mr. Birkenback told me that that could be arranged, he thought." He also said that they told him: "It had to do with a deal between Mr. Birkenback and Mr. Lampe. . . . A deal that they had made between them, and this note had been given Mr. Lampe by Mr. Birkenback."

The architect who drew the plans for the garage building testified that it was completed so that they could move into it about September 1, 1929. About January, 1930, he had a conversation with Birkenback about "additional stories for the building." He said that Birkenback told him "that he was going to buy Mr. Lampe out; that it would be the Birkenback Building instead of the Lampe-Birkenback Building. . . . He said he wanted to refinance the building so he could pay Miller Tire Company, . . . Miller Rubber Company, or tire company, I don't know which, and Lampe." Plaintiff further testified that the note was in his possession all the time after it was made; that he kept it in his pocketbook; that it was the note shown to his two witnesses in Birkenback's presence; and that his witness, who said that Birkenback showed it to him, was mistaken about that. Plaintiff's father also testified that Birkenback told him

that he owed plaintiff a $9900 note given for his interest in the building.

We think that it is clear that this evidence was sufficient to make a jury case. Defendants base their argument for a directed verdict mainly upon the theory that plaintiff was not a competent witness. Otherwise, what they say is more applicable as a criticism of the manner of submission of the case and will be hereinafter discussed in connection therewith. It is apparent (and plaintiff seems to concede it) that alterations showed so plainly upon the face of this instrument and were of such a suspicious character as to demand explanation before it was admissible in evidence. As to the integrity of such a note, "the law presumes nothing and the question as to the time when, the person by whom, or the interest for which, the alteration was made are matters of fact to be found by the jury upon proof adduced by the party offering the instrument in evidence." [State ex rel. Dunklin County v. McKay, 330 Mo. 33, 49 S. W. (2d) 125; Id. 325 Mo. 1075, 30 S. W. (2d) 83; Kircher v. Dunnington, 325 Mo. 355, 29 S. W. (2d) 138; Meffert v. Lawson, 289 Mo. 337, 233 S. W. 31; Mechanics' American Natl. Bank v. Helmbacher, 199 Mo. App. 173, 201 S. W. 383, *certiorari* denied 276 Mo. 559, 208 S. W. 458; Parker v. Staley (Mo. App.), 55 S. W. (2d) 332.] Plaintiff was seeking to recover upon the note in its altered form. By their plea of *non est factum* (under Sec. 966, R. S. 1929, it was sufficient), defendants raised the question of whether Birkenback "executed the instrument as sued on," and "plaintiff held the affirmative of that issue." [State ex rel. Jackson County v. Chick, 146 Mo. 645, 48 S. W. 829; Workman v. Campbell, 57 Mo. 53.] As said in the Helmbacher case, "if the note on its face appears to be in different handwriting, written at different times and in different ink, *this destroys the presumption of integrity.*" In other words, plaintiff could not make a *prima facie* case by the note itself, because there was no presumption of its integrity, so he had to also produce evidence to show that the clearly apparent alterations in the note were properly authorized before the note was admissible as any evidence whatever of an obligation of Birkenback. When plaintiff produced evidence tending to so show, by this, together with the note in evidence, he made a case for the jury; but the burden of proof (to convince the jury of the truth of plaintiff's evidence that Birkenback did assent that he would be bound by the obligation stated in the altered note) remained upon plaintiff. [1 R. C. L. 1045, sec. 80; 2 C. J. 1270-1271, secs. 183-184; Kircher v. Dunnington, supra; State ex rel. v. Chick, supra; Williston on Contracts, secs. 1915-1917; 3 Daniel on Negotiable Instruments, 1731-1737, secs. 1673-1678; Denny v. Darraugh (Ky.), 279 S. W. 1069; see, also, discussion of subject 4, Kansas City Law Review 67.] We hold that plaintiff's evidence

hereinabove stated, to the effect that Birkenback consented to the removal of a signature (or part of a signature) of a maker from the note and the writing of plaintiff's name as payee therein so as to make the note his direct obligation to plaintiff, instead of a partnership obligation to plaintiff or to someone else, was a sufficient explanation of the alterations appearing in the note to make it admissible; that this evidence, together with the note itself in evidence, was sufficient to entitle him to go to the jury; and that the trial court, therefore, did not err in overruling defendants' demurrer to the evidence.

■ Defendants also assign as error the giving of the three instructions offered by plaintiff which (omitting "if you so find" and other phrases of like import) were, in substance, as follows:

Instruction A authorized a verdict for the principal and eight per cent interest if the jury found defendants to be Birkenback's executors, and "further find and believe from the evidence that M. W. Birkenback, in his lifetime, executed and delivered to plaintiff, G. W. Lampe, for a valuable consideration, . . . the promissory note offered in evidence dated January 24, 1930, for $9,900.00, and if you further find and believe from the evidence that *no material alteration was made* in said note, as defined in other instructions, *subsequent to the execution and delivery thereof.*"

Instruction B told the jury if they found that "M. W. Birkenback executed and delivered the note in question to plaintiff;" that "*at the time of such execution and delivery* . . . the signature of *M. W. Birkenback was the only signature to said note;*" that "*some other name was placed or written* below the signature of M. W. Birkenback at the bottom of said note, *at or about the time of the execution and delivery thereof;*" and "*that said name,* so written at the bottom of said note, . . . *was thereafter erased,* with the knowledge and consent, and in the presence of, said M. W. Birkenback, . . . then such writing of said name at the bottom of said note, if you find it was so written, and such subsequent erasure thereof, if you find it was thereafter so erased, do not constitute a material alteration of said note."

Instruction C told the jury if they found "that the note in question was signed by M. W. Birkenback and by him delivered to G. W. Lampe, . . . with the authority to fill in the name of the payee in the third line thereof; . . . and that the name of said G. W. Lampe was thereafter filled in said third line as payee, pursuant to said authority; . . . and if you further find and believe from the evidence that *no material alterations,* as defined in other instructions, *were made in said note after it was executed and delivered,* if you find it was executed and delivered, the law imports a consideration for said note; and, in that case, the burden is upon the defend-

ants to prove by the preponderance or greater weight of the evidence, and not by mere speculation, guesswork or conjecture, that the note in question was, in fact, without consideration, and unless the defendants have so proven to you, you will find the issues in favor of the plaintiff on the question of consideration for said note.''

Defendants particularly complain of Instruction C which they say puts the burden on them to show the invalidity of the note rather than upon plaintiff to show that it was valid. To say the least, this instruction (and we think the other two also) made a very confusing and misleading submission, failing to make clear to the jury the issues they should decide. In the first place, this instruction seems calculated to impress the jury that the defense had to make very positive proof; that the defense evidence was weak; and that this weakness of the defense was decisive of the case rather than the strength of plaintiff's proof. This court has before condemned commenting in instructions, about "guess, conjecture, and speculation," in a case where a party must rely upon circumstantial evidence. [Reynolds v. Maryland Casualty Co., 274 Mo. 83, 1. c. 102, 201 S. W. 1128, 1. c. 1133.] It is for the court to decide whether circumstantial evidence is substantial evidence of an issue, or merely leaves the matter for guess and speculation, when it is ruling on a demurrer to the evidence or passing on instructions. But, if the court finds the evidence to be substantial enough to make a jury issue, there is usually no good reason to make comments in instructions which would tend to weaken the effect of such evidence. Our system is to leave the weight of the evidence to the jury without any comment.

In the second place, it is certainly likely to be confusing to a jury of laymen to tell them in instructions that the law "imports" or "presumes" something. [See State ex rel. Detroit Fire & Marine Ins. Co. v. Ellison, 268 Mo. 239, 187 S. W. 23; Canty v. Halpin, 294 Mo. 118, 1. c. 137, 242 S. W. 97; Fields v. Luck, 335 Mo. 765, 74 S. W. (2d) 35.] As said in the Ellison case, such references to presumptions in instructions to juries are "sometimes useless, sometimes prejudicial, and always illogical." Presumptions usually concern the shifting of the burden of evidence and are for the court rather than the jury. A case illustrating the intricacy of such shifting burdens of evidence is Denny v. Darraugh, supra, see, also, Downs v. Horton, 209 S. W. 595; Id. 287 Mo. 414, 230 S. W. 103.] What the jury should be told is what facts they must believe to be true to reach a verdict. "The tendency of many of the best modern decisions is largely to disregard these rules of presumption and to treat each case upon its own facts so far as the duty of adducing further evidence is concerned, and to throw the burden of ultimate proof upon whichever party has the burden of establishing the issues raised by the pleadings.'' [Williston on Contracts, sec. 1917.]

Section 2653, Revised Statutes 1929, which provides that "every negotiable instrument is deemed *prima facie* to have been issued for a valuable consideration," undoubtedly refers to one admitted to be the instrument executed by the defendant and admissible in evidence without explanation. The introduction of such a note in evidence makes a case for the jury for the holder (whether he be the payee or an admitted transferee) against the maker, because a note admittedly executed proves itself, and the maker has to show why, having assumed the obligation therein stated, he should not be bound by it. The note and evidence of want of consideration makes a jury issue. [Brannan's Negotiable Instruments Law, 371.] The rule in this State is (and we think it ought to be, under the Negotiable Instruments Law) that want of consideration, as to a note admitted to be the instrument executed by the defendant, is an affirmative defense with the burden of proof on the defendant. [People's State Bank v. Hunter, 216 Mo. App. 334, 264 S. W. 54; Farmer's Bank v. Schmidt, 223 Mo. App. 1098, 25 S. W. (2d) 525; Kugman v. Donnell (Mo. App.), 271 S. W. 535; Aetna Inv. Corp. v. Chandler Landscape & Floral Co., 227 Mo. App. 17, 50 S. W. (2d) 195; Thompson v. McCune, 333 Mo. 758, 63 S. W. (2d) 41; North Side Finance Co. v. Sparr (Mo. App.), 78 S. W. (2d) 892.] If plaintiff, not the original payee, claims to be a holder in due course, defendant must not only prove want of consideration, but also notice thereof. [State ex rel. Strohfeld v. Cox, 325 Mo. 901, 30 S. W. (2d) 462.] Nevertheless, even where execution is not denied, authorities elsewhere are hopelessly conflicting as to whether the maker sued by the payee has the burden of proof of want of consideration or only the burden of evidence. [See Brannan's Negotiable Instruments Law, 320; Williston on Contracts, secs. 108 and 1146; Daniel on Negotiable Instruments, sec. 180; 3 R. C. L. 928, sec. 124; 8 C. J. 994, sec. 1299; notes 35 A. L. R. 1370, 65 A. L. R. 904.]

But a note *showing suspicious alterations on its face*, the execution of which *as altered* is denied, if admitted in evidence without a *prima facie* satisfactory explanation, does not make a case for the jury for the payee. [Kircher v. Dunnington, supra.] The maker here does not admit any obligation to the payee. Such a note has no presumption of integrity; it does not *prima facie* prove anything; why should it import anything? If the note has actually been so altered without consent not even a holder in due course can enforce it but must recover, if at all, on what was originally written. [Sec. 2752, R. S. 1929.] Plaintiff could make a *prima facie* case by showing either assent to alterations after delivery or delivery after alterations. He is entitled to go to the jury *on the note and his explanation thereof*, but the note still does not entitle him to recover unless his ex-

planation is believed and he has the burden of convincing the jury that it is true. Proving an obligation equal to the amount of an alleged note as altered, to show actual valuable consideration between the parties therefor, is in such a case a circumstance tending to prove the validity of the altered note when the execution thereof is denied. This would show that the note as altered speaks the truth. [State ex rel. Dunklin County v. McKay, supra.] Plaintiff did here undertake to do so as a part of his case. To find consideration, it was only necessary for the jury to believe that the facts he testified to were true; to find otherwise it was only necessary that the jury disbelieve them; and defendants relied upon plaintiff's conflicting former testimony and other circumstances including the appearance of the note itself to convince them plaintiff's entire story was untrue. The matter of consideration became an inseparable part of plaintiff's explanation to show the validity of the note. For the court then to tell the jury that ''the law imports a consideration for said note,'' and that defendants must disprove its consideration (especially considering the comment about speculation, guess work and conjecture) certainly tended to put defendants under a handicap. This would seem to imply that defendants must overcome something the law imports against them, as well as plaintiff's testimony, and then show positively that there was no consideration. That is a greater burden than even the burden of proof to establish an affirmative defense and we hold that this instruction was, therefore, prejudicially confusing and misleading.

We think that plaintiff's instructions were, in other respects, prejudicially confusing and misleading, and, in view of a retrial, we will point out these further objections. Clearly Instruction C, and all of plaintiff's instructions taken together, present the theory that Birkenback wrote, executed and delivered the note, intending to give and did give his own individual note for his own personal obligation to plaintiff, and that plaintiff thereafter wrote a part of the partnership name on such a note, written only to obligate Birkenback to plaintiff, and then rubbed it off with his consent; so that the original tenor of the note was unchanged. This ignores the wording of the note itself and plaintiff's own testimony. The note says, ''we promise to pay'' and ''we having . . . pledged . . . our ownership in the Lampe Birkenback Co.'' The note shows on its face and plaintiff says that the name ''Lampe'' was written under Birkenback's signature thereon. Defendants contend, and their evidence, together with the appearance of the note itself, was substantial evidence tending to prove that what was written below Birkenback's signature was plaintiff's signature, to-wit: ''G. W. Lampe.'' Plaintiff says that only the word ''Lampe'' was written but, if so, it was nevertheless written with the intent to write and with the understanding with Birkenback

that he would write "Lampe Birkenback Co." Whether he wrote "G. W. Lampe" or "Lampe Birkenback Co.," both by the signatures and by all the terms thereof, the note would in either case be the obligation of the partnership. The pledge therein of "our ownership in the Lampe Birkenback Co." would cover the interest of plaintiff and Birkenback, only, because no one else had any interest in the partnership or was intended to become a maker thereof at the time this note was written. This pledge could not refer to any property of Birkenback's wife because she had no interest in the company. Moreover, plaintiff says that he agreed that the notes should be a partnership obligation to him, and what he wrote was intended to make it that; but that he changed his mind, rubbed out his signature (whether it was "Lampe" or "G. W. Lampe") and wrote in his name as payee which made it an individual obligation of Birkenback to him. (Defendants claimed that he also erased the original payee and that theory was properly submitted.) Of course, it is possible and proper to create an obligation of a partnership to one of the partners. When this is done, such partner is entitled to have the debt to him paid out of the partnership assets. The original purchase of the lot was made by both plaintiff and Birkenback; the building was built as the property of both; plaintiff signed a guaranty of the building mortgage notes; and plaintiff's evidence all tends to show that his alleged advances were originally made to the partnership, if they were made for the building. Of course, whether that was true or not, plaintiff was entitled to submit his theory that Birkenback agreed to take all these over as his personal obligation to him. Nevertheless, the note as Birkenback wrote it did not so provide, but was written as a partnership note.

We do not think there is any escape from the fact that Birkenback wrote and signed the note as a partnership obligation to someone, Both parties must, under this record, start with that fact and submit the case to the jury on that basis. Plaintiff's evidence does not show that, at the time the note was executed, there was any intention to have Mrs. Birkenback sign it before it was delivered. Plaintiff's claim is to the contrary. Plaintiff claims the note was intended to be (and had the right to submit that theory) an obligation to him or to his wife (delivered with no payee named but with authority to write in either name); but when Birkenback wrote it and signed it, plaintiff, according to his own testimony, had agreed that the partnership should be obligated to him for it and the note itself shows that it was written to obligate the partnership and pledge its assets. No other construction can, under the evidence, be put on the note as it was written and executed by Birkenback. Therefore, the change of the obligation from a partnership obligation to an individual obligation of Birkenback only (even though the obligation was at all times in-

tended to be to plaintiff) was a material alteration of the note which rendered it unenforceable, under our statute (Secs. 2752-2753, R. S. 1929), against Birkenback's estate unless he "authorized or assented to the alterations." That is what the jury must find to entitle plaintiff to recover.

Plaintiff's instructions erroneously authorized a finding that no material alteration was made in the note. What plaintiff's evidence tended to show was an alteration after execution and delivery which was material, but "assented to" by Birkenback. Plaintiff's instructions should have required the jury to find that the note was changed with Birkenback's consent, after he executed it, from a partnership obligation to a personal obligation of Birkenback only. Of course the note would be enforceable against Birkenback if, after the alteration was made, he delivered it thus altered, but plaintiff's theory was that all additions and erasures thereon were made after the note had finally left his possession (Instruction B says "written . . . at or about the time of execution and delivery" and "thereafter erased"), and plaintiff's testimony was that the note was never in Birkenback's possession after he signed it and handed it to plaintiff to be completed as a partnership obligation. [As to alterations before delivery which may avoid a note see Williston on Contracts, secs. 1913, 1914.] If it was executed and delivered to be a partnership obligation, plaintiff could not enforce it against Birkenback's estate, as a personal obligation unless he could convince the jury that Birkenback consented for him to make alterations to so change it; that is, to take off the name he put on, whether it was his own name or part of the partnership name. "Any alteration, which may in any event alter the rights, duties, or obligations of the person sought to be charged, is material in the legal sense." [Paxon v. Kregel Casket Co., 223 Mo. App. 151, 9 S. W. (2d) 856.] "If mistakes do arise in the preparation of written instruments, aside from the consent of all parties to the needed correction, the courts of the country alone can furnish adequate redress, and we will not give sanction or countenance to the attempts of an interested party to effect by his own hand the desired reformation; as an honest blunder of this sort, if upheld in one instance, might necessitate sanctioning an alteration having that appearance but which from the infirmity of human testimony, might be grossly otherwise." [First National Bank v. Fricke, 75 Mo. 178; as to filling blanks and as to alterations in collateral agreements see Bruegge v. State Bank of Wellston (Mo.) 74 S. W. (2d) 835, l. c. 840.] Even if there was consideration for a debt of the partnership to plaintiff, the note as altered was not valid unless Birkenback assented to the alteration. Plaintiff had the burden of proof to convince the jury that the note, as altered, was the very obligation that Birkenback intended to assume when he signed and delivered the note or that he assumed

it by consenting to the alterations which made it state the obligation that it does now state as altered.

Defendants also assign as error the refusal of their Instruction No. 8. This was not a correct instruction, and the court properly refused it, because it told the jury that they should find that the instrument in question was not Birkenback's note "if you find and believe that it is *more probable* that such changes or alterations have been made in the instrument after it was signed by the deceased and without his knowledge and consent, than it is that such alterations and changes were made at or about the time that the deceased signed the instrument and under his direction and with his knowledge and consent." The trouble with this statement is that a verdict must be based upon what the jury finds to be facts rather than what they find to be "more probable." The burden of proof requires the party carrying it to prove to the jury the facts, upon which his case or affirmative defense depends, by a preponderance or greater weight of the credible evidence. This means merely that the party, who has the burden of proof, must produce evidence, tending to show the truth of those facts, "which is more convincing to them as worthy of belief than that which is offered in opposition thereto." [Rouchene v. Gamble Const. Co., 338 Mo. 123, 89 S. W. (2d) 58, and cases cited.] If, as to the truth of essential facts, the evidence of the party having the burden of proof is not accepted by the jury as credible over the evidence to the contrary, he is not entitled to have a verdict. [See Mc-Closkey v. Koplar, 329 Mo. 527, 46 S. W. (2d) 557.] In other words, if the jury cannot make up their minds whether to believe or not to believe that facts essential to a party's case or affirmative defense are true, then as to such issue they must find for the opposite party. They must not attempt to base a verdict upon what facts may be "more probable," if they cannot decide what facts are true. Of course ordinarily, "a verdict for defendant need not be supported by affirmative substantial evidence" because the plaintiff usually has the burden of proof. [See Bloch v. Kinder, 338 Mo. 1099, 93 S. W. (2d) 932.] Burden of proof instructions should be confined to simple, direct statements (Rouchene case, supra), because "if an attempt is made to go into degrees of preponderance of evidence, it is almost certain to get the matter so complicated that a jury of laymen will have no idea at all as to what is meant."

The judgment is reversed and the cause remanded. *Ferguson* and *Bradley*, *CC.*, concur.

PER CURIAM:—The foregoing opinion by Hyde, C., is adopted as the opinion of the court. All the judges concur.