IN THE MATTER OF THE ESTATE OF S. PETERSON, ALSO KNOWN AS SVANTE PETERSON, ALSO KNOWN AS SWANEY PETERSON, DECEASED.
MILDRED JANE CLOSE, APPELLANT, *v.* JUANITA D. FLANARY, FRANCES ATKINSON, VERN HURSH, NEVADA CHAPTER OF THE NATIONAL FOUNDATION FOR INFANTILE PARALYSIS, RESPONDENTS.

No. 4304

February 22, 1961                    360 P.2d 259

See also 75 Nev. 255, 339 P.2d 379.
(Petition for rehearing denied March 20, 1961.)

*Nada Novakovich,* of Reno, for Appellant.

*Lohse and Fry,* of Reno, for Respondent Security National Bank, Special Administrator, Juanita D. Flanary and Vern Hursh.

*Bible, McDonald and Jensen,* of Reno, for Respondent Nevada Chapter of the National Foundation for Infantile Paralysis.

*Margaret Faires Baily,* of Reno, for Respondent Frances Atkinson.

# OPINION

By the Court, BADT, C. J.:

This is an appeal from the judgment admitting to probate the will of the above-named decedent dated May 27, 1955 and from the order denying appellant's motion for new trial. An earlier will dated May 4, 1953 was revoked by the later will. The effect of the judgment is likewise to deny relief to appellant sought in her contest of said will and in her petition to revoke the probate thereof. The judgment was based on the special verdict of the jury answering six specific interrogatories. Such interrogatories and the answers thereto are as follows:

"1. Did the said Svante Peterson at the time of the destruction of the Will of May 4th, 1953, and at the time of the execution of the questioned Will which is dated May 27, 1955, possess testamentary capacity as defined in the instructions?

Yes

---

(Answer 'Yes' or 'No')

"2. Was the signing of Svante Peterson of the questioned Will dated May 27, 1955 procured by the undue influence of Raymond S. Flanary?

No

---

(Answer 'Yes' or 'No')

"3. Is page numbered '2' of the said questioned Will dated May 27, 1955 a substituted page and not the original '2' of said questioned Will?

No
_____
(Answer 'Yes' or 'No')

"4. Was the signature on page 2 of said questioned Will dated May 27, 1955 forged by Raymond S. Flanary?

No
_____
(Answer 'Yes' or 'No')

"5. Is the signature on the Will dated May 27, 1955, the guided signature of Svante Peterson?

Yes
_____
(Answer 'Yes' or 'No')

"6. Was the questioned document dated May 27, 1955, attested by at least two competent witnesses, subscribing their names to the Will in the presence of the testator?

Yes
_____
(Answer 'Yes' or 'No')"

The foregoing interrogatories and answers indicate the nature of the contest. However, for further explanation of the specific grounds of such contest and of appellant's petition for revocation of probate, we note the recitals in her petition as follows:

1. That such will is not the last will and testament of the decedent and that it is invalid.

2. That at the time of the execution of such will the testator was not of sound mind and memory but was mentally incapacitated.

3. That the will was not executed, attested and subscribed in conformity with the statutory requirements.

4. That such will does not bear the genuine signature of the testator, and was not signed by him or by some person in his presence or by his express direction.

5. That the will was forged by Raymond S. Flanary.

6. That it was not attested by at least two competent witnesses subscribing their names in the presence of the testator.

7. That it was procured by the fraud and undue influence of Raymond S. Flanary.

8–9. That said Flanary substituted page 2 containing a bequest to him of $10,000 and bequest to his wife of $5,000 after the purported attestation and subscription of the will itself, which had not contained such bequests.

10. That the said bequests and other bequests are unnatural, unreasonable, and unjust and to purported beneficiaries who were not the natural objects of the testator's bounty.

11. That said Flanary destroyed a prior will dated May 4, 1953 which had been properly executed and attested when the testator was competent and which had named the protestant as sole beneficiary.

12. That said Flanary had in his own possession the will of May 27, 1955 from that date to August 9, 1955, when it was offered for probate.

Such listing also included sundry evidentiary matters in support thereof, which, so far as necessary, are referred to later. The material allegations of the contestant are denied by answer of the proponents but such proponents admitted the value of the estate as [$140,000]; that they are the beneficiaries named in the will; that the protestant was the sole beneficiary of the former will of May 4, 1953; that the testator at the time of the execution of the admitted will was blind and approximately [83] years of age; that Flanary was an attorney at law and the attorney for the testator at the time of the execution of his 1955 will; that the relationship of attorney and client existed between Flanary and the testator at the time; that Flanary drafted such will, but under the directions and instructions of the testator; that it was typed on his stationery; that by it he was granted a bequest of $10,000 and his wife a bequest of $5,000, and that Flanary was named therein as executor; that the will was typewritten on four pages, the signature of the testator appearing on page 2, the same page bearing the bequests to Flanary and his wife; that the will of May 4, 1953 was destroyed by

Flanary, but under specific instructions from the testator, who thereby intended to revoke said will of May 4, 1953.

On April 16, 1958, Flanary submitted his resignation as executor and in open court on April 21, 1958 renounced his legacy.

On the issues thus made the case went to the jury, with the resulting special verdict above recited. The case took ten days to try, and the record before us includes a thousand pages of testimony, four volumes of pleadings and exhibits, in addition to numerous large exhibits, from which opposing expert handwriting witnesses testified. These are the usual enlarged photographs of the admitted genuine signature of the testator and of the signature on the questioned document. The briefs on appeal in this court comprise some 600 pages,[1] and cite some 300 authorities.

## FUNCTION OF THIS COURT

The labor of this court will be greatly lightened by our disposition of appellant's first contention. Relying on an opinion of the Supreme Court of Oklahoma in Anderson v. Davis, 208 Okla. 477, 256 P.2d 1099, and upon an opinion of the Supreme Court of Missouri in Schneider v. Johnson, 357 Mo. 245, 207 S.W.2d 461, appellant asserts that will contest cases are purely of equitable cognizance and that it is the duty of this court to weigh the evidence and direct the entry of such judgment as we consider proper under such evidence. Such is not the rule in Nevada. Agricultural Insurance Co. of Watertown, N. Y. v. Biltz, 57 Nev. 370, 64 P.2d 1042. As in cases at law, we do not disturb the findings of the court or the jury when supported by substantial evidence. Such also seems to be the rule followed in a majority of

---

[1] There is no present rule of this court limiting the length of briefs, although such rule has been in contemplation for some time. The matter of restricting the length of briefs is on the agenda for the next Conference of Chief Justices.

the state courts. On all the factual issues presented in appellant's opening and reply briefs—the asserted mental incompetency of the testator, undue influence exercised upon him, forgery of his signature, the substitution of a spurious page in his will, the challenged execution, subscription, and attestation thereof—appellant attacks the credibility of the proponents' witnesses, and contends that the evidence preponderates in favor of the contestant of the will. These were all arguments for the jury and the trial court.

Appellant's specific assignments of error are as follows: 1. The judgment is against the *weight of the evidence* on all issues. 2. Proponents failed to meet their *burden of proof* that the testator was mentally competent at the time of the execution of the contested will. 3–4. The proponents did not *rebut* the presumption of fraud or of undue influence. 5. The contested will was not executed, attested, and subscribed according to law, and that the judgment to the contrary is against the *weight of the evidence*. 6. Proponents did not meet their burden of *proving* the due execution, subscription, and attestation of the will. 7. The judgment to the effect that page 2 of the will is not a substituted page is against the *weight of the evidence*. 8. The overruling of contestant's objection to the testimony of the attesting witnesses as to the contents of the will. 9. The judgment that the signature on page 2 of the will is not a forgery is against the *weight of the evidence*. 10. Error of the trial court in overruling contestant's objection to testimony of Raymond S. Flanary as to purported conversations with the testator. 11. Error in allowing instructions 5, 8, 11, 12, and the form of the special verdict. 12. Error in refusing contestant's requested instructions 1–24, inclusive. 13. Error in overruling the objection to the testimony of Vern Hursh, a beneficiary, to conversations with the testator. 14. Error in overruling the objection of the contestant to the testimony of Vern Hursh as to the competency of the testator. 15. Error in overruling contestant's objection to the testimony of Frances Atkinson, a beneficiary, to testify to the competency of the testator. 16. Error in

limiting cross-examination of Marg McElee. 17. Denial of new trial based on misconduct of jury.

It will be noted that assignments of error Nos. 1, 3–4, 5, 7, and 9 are all based upon insufficiency of evidence. The issues to which these assignments are directed are the identical issues of fact disposed of by the jury's special verdict. Under our notation above as to the function of this court, our review will be limited to ascertainment of whether there was substantial evidence to support the special verdict of the jury as to each of the items to which the specification of error is directed. We shall then devote our attention to the remaining specifications, which raise questions of law.

Assignment of error No. 1 is simply an accountant's total of all the other assignments having to do with the weight of the evidence. It does not require separate attention.

Assignments 3–4 are to the effect that the presumption of fraud and undue influence was not rebutted. This has to do with the execution of the testator of the will of May 27, 1955, the document in question. As we understand the specification of error, then, it is that the proponents of the will did not present substantial evidence to rebut the presumption. The presumption of undue influence was properly presented and covered by an appropriate instruction to the jury. As noted, the proponents admitted that the protestant was the sole beneficiary under an earlier will, that the testator was 83 years of age and blind, that the relationship of attorney and client existed between Flanary and testator, that Flanary drew the will, that it was typed on his stationery, and that under it he received a bequest of $10,000 and his wife a bequest of $5,000 and that he was named therein as executor. That a presumption of undue influence arose under this situation cannot be questioned. The jury found that the signing of the will by the testator was not procured by the undue influence of Flanary. Since our duty begins and ends with a determination

of whether there is adequate substantial evidence to support this finding, it would be idle to attempt to analyze the evidence submitted by appellant in conflict with that offered by the respondents. In re Llewellyn's Estate, 83 Cal.App.2d 534, 189 P.2d 822, 191 P.2d 419. We turn, then, to the evidence offered by the proponents of the will to rebut the presumption of undue influence. The element of fraud, as we analyze the case, is included in this issue.

### UNDUE INFLUENCE

We start with the fact that one Paul Danzger, who took Peterson on almost daily walks in the spring of 1955, took Peterson, at the latter's request, on several occasions in May of 1955 to Flanary's office. Flanary requested him not to advise the appellant of these visits. That Peterson intended to change his former will of 1953 was the testimony of other witnesses. Peterson had theretofore transferred and conveyed to the protestant sundry pieces of property of considerable value—probably in excess of $60,000, and the witness, Frances Atkinson, testified to statements made by him in the spring of 1955 that Mrs. Close had received all he wished her to have. One Vern Hursh testified to similar statements made by Peterson to him.

With that background, we turn to the testimony of *Flanary*. He testified that on May 11, 1955 Peterson requested *him* to bring Peterson from the City of Sparks to Reno, some three or four miles distant, to the Nevada Bank of Commerce so that he could examine some bonds to see if it was time to clip the coupons. It should be recalled that Peterson was some 83 years of age and blind except for his ability to distinguish light from darkness to some extent. Flanary testifies that he brought Peterson to Reno to the bank. Danzger accompanied them but remained in the automobile. Peterson produced his keys from his pocket and they obtained entry to his safe deposit box, Flanary signing the card as attorney in fact. They went to the box, opened it and had the attendant check to see if the coupons were due on the

bonds. The attendant examined the bonds and advised that the coupons were not due. Peterson then asked Flanary to hand him his will, the will of 1953, in which appellant was the principal beneficiary. Flanary handed him the will. Peterson put it in his pocket. On the way back to Sparks he asked Flanary to keep it for him, as he wanted to make a change in it. Some days before May 27, 1955, he came to Flanary's office, they discussed the will of 1953, Peterson advised of the changes he wanted and Flanary noted these on the original document. Within the next day or two Flanary prepared the May 1955 will. In the early afternoon of May 27, 1955 Peterson called at Flanary's office, who advised that the will was ready, read the new will to Peterson, Peterson approved it, and instructed Flanary to destroy the 1953 will, which Flanary thereupon did in Peterson's presence. Danzger had accompanied Peterson to Flanary's office and the three of them proceeded to Reno to the Bank of Commerce.

All the foregoing is recited from the record of Flanary's testimony.

He was subjected to a long and rigorous cross-examination. Appellant calls attention to discrepancies in his testimony and to parts of his testimony that she characterized as incredible. She also attacks the testimony of Vern Hursh and Frances Atkinson as patently interested witnesses who would benefit each to the extent of a $5,000 legacy under the 1955 will. These attacks were matters for consideration of the jury. It would serve no purpose for us to pursue them.

On this state of the record there was sufficient before the jury to decide that the presumption of undue influence had been rebutted to their satisfaction. However, such rebuttal of the presumption received further important support from what occurred at the bank when the will was executed. We turn next to the matter of the execution and attestation of the will, but would add the events of what occurred there to Flanary's testimony as substantial evidence rebutting the presumption of undue influence.

THE EXECUTION AND ATTESTATION OF THE WILL

Appellant's assignment of error No. 5, as noted, attacks the judgment that the will was executed, attested, and subscribed according to law as against the weight of the evidence. It will be recalled that the special verdict of the jury was that the signature on the will was the guided signature of the testator and that it was on the same date, May 27, 1955, attested by at least two competent witnesses, subscribing their names as such in the presence of the testator.

As to what happened at the bank we turn again, first, to Flanary's testimony. He testified that he had made an appointment with Mr. Andrew F. Johnston, trust officer of said bank. When he arrived at the bank he requested Mr. Johnston to provide "a couple of more witnesses, that Mr. Peterson wanted to execute his will." Mr. Johnston called Mr. Small and Mr. Cavigilia, two other employees of the bank. Flanary introduced Mr. Peterson to them and told them the object of their visit—that Peterson wanted to execute his will. The five men went into the directors' room. As the two other employees went in, Flanary introduced them to Peterson and stated the object of their presence, that Mr. Peterson wanted to execute his will and wanted them to be witnesses to it. They all sat down around the table in the directors' room and Flanary again announced that Peterson wanted to make his will and wanted them to be witnesses. Peterson assented. The foregoing is the testimony of Flanary. He proceeded further: "I then read the will to him in full, paragraph by paragraph, and asked him if that is what he wanted his will to read and he answered, 'Yes.' And finally I got to the point where he was ready to sign. I placed the pen in his hand and kind of held his hand on the edge of the desk and told him, 'All right, Swaney, you can sign now.' And he made this 'S' here. And he says, 'I can't. Help me.' So I helped him to sign the rest of his signature. Thereafter the witnesses signed by passing the will around the table and signing it. And I believe it was Mr. Johnston stepped to the door or stepped out around the door

and asked that a notary come to notarize the affidavit on the will." He then testified that Peterson asked him to keep the will for him, that he put it into an envelope and sealed it, took it back to Sparks and deposited it in his (Flanary's) safe deposit box in the Sparks bank.

Andrew F. Johnston testified to his position as trust officer, and before that as assistant trust officer, for the Nevada Bank of Commerce for some 14 years. Prior to that he worked for the Bank of America in San Francisco in the administration of trusts for some 22 years. Although he did not know Swaney Peterson personally, he knew who he was. On May 27, 1955 Peterson came to the bank with Flanary to execute his will. He places the time at about one thirty in the afternoon of that day. He testified: "Mr. Flanary and Mr. Peterson came in about one thirty in the afternoon and Mr. Flanary mentioned that we were here to execute his will. This (identifying the document handed him) was the will that was executed in my office on the 27th day of May, 1955." He then told about bringing Mr. Gene Small and Mr. Tommy Cavigilia to act as witnesses. While they were being brought in, he and Small talked to Mr. Peterson "for a minute or two." Flanary again mentioned that Mr. Peterson was there to execute his will. "And so I asked Mr. Flanary if he would read the will out loud so that everybody in the room could hear it before it was executed, and as he read the different clauses, I asked Mr. Peterson, 'Is that in accordance with your wishes?' and he said, 'Yes.' * · * * After the signature was affixed by Mr. Peterson, I then affixed my own signature as a witness to the will. I saw Mr. Gene Small and Mr. Tommy Cavigilia sign in my presence and in the presence of Mr. Peterson."

Mr. Cavigilia, who had known Peterson for two years prior to the date of the execution of the will and had helped him in some commercial transactions, testified to the same meeting at the bank with Peterson, Flanary, Johnston, Small, and himself present. He testified that Peterson came into the bank with Flanary to have his last will and testament witnessed; that Mr. Johnston requested that the will be read aloud and that when that

was accomplished the paper was signed "and we witnessed it. * * * Realizing that Mr. Peterson was totally blind, Mr. Flanary placed the pen in Mr. Peterson's hand and guided the pen to the line where he was to sign and assisted him in the signature." After that, he signed and Mr. Small and Mr. Johnston signed, in his presence and in the presence of Mr. Peterson. Such is the testimony of Mr. Cavigilia.

Gene R. Small had been employed by the Nevada Bank of Commerce for about 13 years. He knew who Peterson was but not personally. He had seen him come into the bank on several occasions. His testimony was similar to that of Mr. Johnston and Mr. Cavigilia. He said, "The will was read. Mr. Peterson was asked whether it was in accord to his wishes, which he said, 'Yes.' The will was signed. And we acknowledged it as witnesses for Mr. Peterson * * *. The three of us signed after Mr. Peterson had signed. I don't recall what order."

The cross-examination of the witnesses to the will developed certain inconsistencies. Appellant argues them at length. The jury, under proper instructions, found that the will had been signed by the testator and attested at least by two competent witnesses. That such finding finds substantial support in the testimony quoted can hardly be disputed.

## THE ISSUE OF THE SUBSTITUTED PAGE

Assignment of error No. 7 is that the judgment that page 2 of the will is not a substituted page is against the weight of the evidence. The jury found that it was not a substituted page but that it was the original page 2. Again we can accept the assignment of error only as an assignment that there is no substantial evidence to sustain the finding. Again we turn to the testimony of Mr. Johnston, one of three attesting witnesses. He testified that the instrument that he attested was in the same form as it was while holding it in his hand on the

witness stand, that all the sheets were in the same order and attached to the cover. The other two attesting witnesses were not questioned on the point, either on direct or cross-examination, but all the subscribing witnesses testified that the will was read aloud before it was executed, and two of the witnesses testified to their recollection of the reading of the bequest to Flanary. The jury, if it accepted this testimony, as it apparently did, had the right to mark the lack of logic in the charge that Flanary *later* substituted a page for the very page that gave him his $10,000 legacy. And that Flanary substituted the page *before* the signing and attestation was apparently likewise rejected by the jury in view of the testimony that the will was read aloud, paragraph by paragraph, and approved by the testator. Mr. Flanary testified, as above noted, that the will, after its execution and attesting, was placed in an envelope and sealed and placed in his safe deposit box at his bank in Sparks. He further testified that it had not been taken out of the envelope but remained in the sealed envelope until it was delivered by Flanary to the clerk of the court, shortly after Peterson's death. Mr. Clark Sellers, the expert on questioned documents, also testified that in his opinion page 2 was present at the time the will was executed.

We are compelled to hold that the foregoing is substantial evidence supporting the fact that the instrument presented for probate was the same instrument, without any substitution of a page, that had been signed by the testator and attested by the witnesses at the bank on May 27, 1955.

## THE ASSERTED FORGERY OF THE TESTATOR'S SIGNATURE

Appellant's assignment of error No. 9 is again that the finding that the signature was not forged but was the guided signature of the testator is against the weight of the evidence. Again our inquiry is directed only as to determining whether this finding is substantially

supported. Flanary testified categorically, "These pages, these four pages [the will held in his hand on the witness stand] are the identical papers that were in the bank on that day, May 27, 1955. * * * I did not substitute any page 2. * * * I did not forge the instrument and I did not trace it from any other signature either."

Two eminent handwriting experts, Mr. Clark Sellers and Mr. Albert D. Osborn, were called by the respondents and testified at considerable length. In their direct testimony and in their testimony upon the lengthy and intensive cross-examination they stated definitely and repeatedly that the signature of the testator to the will was not forged. Much of the questioning had to do with the guiding of Peterson's hand by Flanary. Mr. Sellers' ultimate conclusion on cross-examination, from which he refused to be shaken, was, "I could find no evidence in the questioned signature that it is a forgery. But I do find evidence, and I think definite evidence, that corroborates Mr. Flanary's statement as to how the signature was signed." Mr. Osborn was in agreement.

## COMPETENCY OR INCOMPETENCY OF THE TESTATOR

Appellant devotes some 80 pages of her brief to a review of the testimony having to do with the physical and mental condition of the testator. She reviews at length the testimony of her witnesses as to the testator's age of 83 years, his blindness, his inability to feed or clothe himself, his senility in general, his hallucinations of little horses flying around the room and wrinkling their noses at him, and his chasing them away by spitting at them, the limitation of his conversations to business deals of his early days in Sparks, and other similar habits and characteristics, his admission to the hospital for "senility and catarrhal deafness, partial blindness," with admitting diagnosis of "senility with accompanying weakness" according to the hospital records, the further notation in the hospital report upon his discharge that his condition was not improved, the necessity for restraining him while he was in the hospital,

the necessity for admission of nasal oxygen to him while in the hospital, etc. She notes that the testator's hospitalization occurred only 15 days after the execution of the will. Again we may note that our task is not to measure the weight of this evidence against the evidence of his mental competency, which the jury found to exist. Our task, as addressed to the other factual issues, is again to determine whether the jury's verdict of competency is based on substantial evidence.

The three subscribing witnesses, though not making a "specific examination" of the testator, testified to his competency. The respondents produced many lay witnesses, some of whom knew the testator only casually and for relatively brief periods and some who had known him for a great many years, some of whom saw him infrequently and some frequently. These witnesses testified by using varying expressions, but agreeing in general that the testator was competent. It is unnecessary to review such testimony. Two doctors who had attended the respondent in the hospital, while agreeing to Peterson's senility, and the fact that he was hard of hearing and blind, considered that he was mentally competent. The third doctor, an ophthalmologist, attended the testator only with reference to the latter's blindness due to glaucoma, but expressed the opinion that Peterson was "extremely competent." A special nurse attending Peterson while he was at the hospital from June 6 to June 11, 1955 and who had several lengthy conversations with him, testified that he was "perfectly competent."

Appellant, in her oral argument and in her voluminous opening and closing briefs categorically asserts that the testator was, over a considerable period of time, including the time of the execution of his will in May 1955 and his hospitalization, suffering from senile dementia. She makes much of the fact that the death certificate indicated that he died on August 2, 1955, something over two months after the execution of the will by cerebral accident, "due to generalized arteriosclerosis." Nowhere, however, is there any direct testimony that Peterson was suffering from senile dementia. Although

appellant vigorously attacks the testimony of all the respondents' witnesses, asserting contradictions, discrepancies, insufficient opportunity for observation, personal interest in the result of the litigation, etc. (and we may say that respondents just as vigorously attack the testimony of the appellant's witnesses), these were all matters for the consideration of the jury, which apparently accepted as true the testimony of the respondents' lay and professional witnesses. That such testimony amounted to substantial evidence in support of the jury's verdict of competency seems to us beyond dispute. This is as far as we need go on this issue.

### BURDEN OF PROOF AS TO COMPETENCY OR INCOMPETENCY OF TESTATOR

Appellant contends that the burden was upon the proponents of the will to prove that the testator was mentally competent at the time of his execution thereof on May 27, 1955, and that the proponents failed to meet such burden.

From 2 Page on Wills, Lifetime Edition, 489, Evidence of Capacity, sec. 767, we learn that there is a hopeless division of authority on the question of the burden of proof as to mental capacity. The notes refer to numerous jurisdictions which hold that the burden of proof is upon the party who alleges incapacity, as well as numerous other jurisdictions which hold that the burden of proving competency is upon the proponents of the will. There has apparently been no occasion for this state to adopt either rule in the past. Nor do we find it necessary to adopt one rule or the other for the purposes of this opinion. There was ample substantial evidence to support the jury's special verdict that the testator was mentally competent. In such situation we need not determine where the burden of proof lay. See our discussion under title "Competency or Incompetency of Testator."

### BURDEN OF PROOF OF DUE EXECUTION, SUBSCRIPTION, AND ATTESTATION OF WILL

Again we find it unnecessary to discuss the question whether this burden of proof lay upon the proponents

of the will or the contestant. Under the heading "Execution, Subscription, and Attestation of Will" we held that the special verdict finding due execution, subscription, and attestation found substantial support in the evidence, and it is unnecessary to inqure further.

### Rulings on Admissibility of Evidence

Appellant's specification of error No. 8 is that "trial court committed prejudicial error in allowing the testimony of attesting witnesses to the contents [of the will]." The ground of the objection was that the content of the will, the desire of the testator, must appear from the paper itself and is not established as a man's will merely by proving that he intended to make a disposition of his property similar to or even identical with the disposition made in the paper. The matter before the court at the time is not the establishment of the contents of the will but the question whether the instrument admitted to probate, and whose probate the contestant sought to revoke, was the same instrument as that executed, signed, and attested or was, as contended by protestant, an instrument whose page 2 had been substituted after the execution. The witness in identifying the instrument in his hand as the same instrument which he had attested at the bank was simply identifying characteristics thereof to show the absence of any change. In like manner similar testimony of the other two attesting witnesses was received over objection. As noted, the issue being tried was the identity of the instrument itself, and not an instrument that had been changed by the substitution of a spurious page numbered 2, but was the identical instrument that had been executed by the testator and attested by the witnesses. The content of the will was proved by the introduction of the instrument itself. The testimony was not offered for the purpose of proving the content. The objections were properly overruled.

Appellant's specification No. 10 is that the trial court

committed prejudicial error in allowing Flanary to testify to conversations had with the decedent. Objection was made under the deadman's rule NRS 48.010 and NRS 48.030 when Mr. Flanary was shown the will of 1953 and testified to numerous pencilled notations in the margin with reference to changes he said had been directed by the testator. This was at the meeting of the testator and Flanary at the latter's office in May 1955, pursuant to which Flanary drew the will of May 27, 1955.

In considering the application of the statute to such situation, the relationship of the parties to the proceedings involved must be kept in mind. Flanary sought to establish the will of 1955. So did the beneficiaries under that will. Appellant, Mrs. Close, sought to prove the invalidity of the 1955 will (including its revocation of the 1953 will) and to establish the existence of the assertedly unrevoked 1953 will. The absent and minor heirs, appearing through court-appointed counsel in an earlier proceeding that reached this court (Estate of Peterson, Close v. Flanary, 75 Nev. 255, 339 P.2d 379), could profit only if the decedent had died intestate, which could result only if both the 1953 will and the 1955 will were declared invalid. Thus we have a situation in which the testimony of Flanary, with reference to instructions received by him from the testator, had to do only with which of the parties could participate in the distribution of the estate. The proceedings did not involve a claim against the estate which would tend to reduce or impair it. The objection to Flanary's testimony was properly overruled. In the Matter of the Estate of Lucy V. Kimble (Kimble v. First National Bank, Special Administrator), 73 Nev. 25, 307 P.2d 615, and cases therein cited. See also Hough v. Reserve Gold Mining Co., 55 Nev. 375, 35 P.2d 742. In re Swartz's Will, 79 Okla. 191, 192 P. 203, 16 A.L.R. 450; In re Miller's Estate, 31 Utah 415, 88 P. 338; 97 C.J.S., Witnesses, sec. 288, p. 815; Lampe v. Franklin American Trust Co., 339 Mo. 361, 96 S.W.2d 710, 107 A.L.R. 465. Appellant relies strongly upon In re Golding's Estate, 58 Nev. 274, 76 P.2d 1099, but we do not find the case in point. Nor do

we find anything in Burgess v. Helm, 24 Nev. 242, 51 P. 1025, or in Su Lee v. Peck, 49 Nev. 124, 240 P. 435, contrary to the views expressed.

The foregoing discussion has to do with appellant's asserted violation of NRS 48.010.[2] Appellant asserts in addition that the admission of the evidence is in violation of 48.030.[3] That section, however, refers exclusively to actions against an executor or administrator upon a claim or demand against the estate of a deceased person and is not applicable to this proceeding. Appellant insists that she is protected by the statute because she is the executrix named in the will of May 4, 1953. The present proceeding, however, involves only the will of May 27, 1955.

Appellant also contends that as Flanary was a party to the proceeding, this fact alone disqualified him as a witness. This is based upon the old common-law rule, which has never been the rule in this state.

Assignment of error No. 13 asserts error in overruling the objection to the testimony of Vern Hursh to a conversation with the testator. He testified to a conversation in which the testator said: "Vern, I made a new will. * * * I mentioned you in the will and Mrs. Atkinson and have Flanary as my administrator. I said,

---

[2]"* * * No person shall be allowed to testify:

"(a) When the other party to the transaction is dead.

"(b) When the opposite party to the action, or the person for whose immediate benefit the action or proceeding is prosecuted or defended, is the representative of a deceased person, when the facts to be proven transpired before the death of such deceased person; provided, that when such deceased person was represented in the transaction in question by an agent who is living, and who testifies as a witness in favor of the representative of such deceased person, or, when persons other than the parties to the transaction, claiming to have been present when the transaction took place, testify as witnesses in favor of the representative of such deceased person, in such case the other party may also testify in relation to such transaction."

[3]"The following persons cannot be witnesses: * * *

"3. Parties or assignors of parties to an action or proceeding, or persons in whose behalf an action or proceeding is prosecuted, against an executor or administrator upon a claim or demand against the estate of a deceased person, as to any matter of fact occurring before the death of such deceased person."

'Well, what did you do for Mildred?' And his very words was, 'Mildred [the appellant] has been well taken care of.' * * *" For the reasons above expressed and under the authorities there cited there was no error in overruling the objection.

Designations of errors Nos. 14 and 15 are to the court's overruling of objections to the testimony of Vern Hursh and Frances Atkinson with reference to the competency of the testator. Appellant says: "Both are interested parties and the law is clear that beneficiaries under a will are not competent to testify as to the competency of the testator." The authorities do not substantiate this statement as to the competency of witnesses. To the contrary, the theory of disqualification by interest has long since been abandoned. See Wigmore on Evidence, Third Edition, Vol. 2, 686, sec. 575, and quotation therein from Jeremy Bentham.

Assignment of error No. 16 is the court's refusal "to allow appellant to test the competency of Marg McElee." Mrs. McElee had testified to her acquaintanceship with the testator in the spring of 1955, to numerous conversations with him, and that "he was as competent as anyone else, as you or anyone." On cross-examination appellant asked the witness if she had ever been a member of a nudist colony, to which she replied, "Never." Appellant pursued her line of questions as to nudists and nudist colonies and whether the witness was a nudist, and finally asked: "I would like to know what a nudist is?" At this point respondents objected on the ground that the matter was completely immaterial and beyond the scope of direct examination. The matter was largely in the court's discretion, and we see no materiality in the question and no error in its sustaining of the objection.

### INSTRUCTIONS TO THE JURY

Assignment No. 11 is that there was prejudicial error in allowing instructions 5, 8, 11, and 12, and the form of the special verdict.

Instruction No. 5 instructed the jury that the signature of a testator to a will is not invalid by reason of another person's having aided or guided the hand of the testator in signing his name. It further instructed that such assistance is often necessary because of the physical condition or the blindness of the testator. Further explanation was contained in the instruction. The assignment of error is based on the fact that the statutes of this state do not specifically provide such rule. This is without merit.

Instruction No. 8 explained at length what factors were to be taken into consideration in determining whether a testator had testamentary capacity. The objection is to the following sentence contained in such instruction: "Old age, blindness, senility, physical weakness and infirmity, and disease, are not necessarily inconsistent with testamentary capacity." The objection is that this is a comment on the evidence. We do not so consider it. By far the greater part of the testimony adduced by appellant on the issue of competency had to do with the testator's old age, blindness, senility and the arteriosclerosis from which he suffered. Many pages of appellant's cross-examination of respondents' expert witnesses were full of references to "senile dementia," which diagnosis the witnesses rejected. Under the circumstances the instruction was proper.

Instruction No. 11 defined forgery as "the false making, a making with an evil mind, of any written instrument for the purpose of fraud or deceit." The objection is that "all of the elements of forgery are not present." This is the language approved in State v. McKiernan, 17 Nev. 224, 30 P. 831. Nor can we see how the appellant could have been prejudiced for the failure of the court to insert many more conditions and requirements to constitute forgery. It was the appellant who was asserting that Flanary was guilty of forgery. The inclusion of many additional requirements to prove forgery

would have prejudiced rather than aided appellant's case.

The objection to instruction 12 is that, "It does not give the law relating to confidential relationships." The instruction did instruct the jury that when an attorney drafts a will for his client, and the will contains a gift to the attorney, the law raises a rebuttable presumption that the gift was the result of undue influence. To instruct further that the relationship between attorney and client was a confidential relationship would have added nothing to the instruction. Indeed, the instruction as given is a stronger instruction against Flanary than if it had contained such additional matter.

The objection to the form of the special verdict is because "it omitted the issue of fraud." When the jury found that the testator's signature was not procured through the undue influence of Flanary, that page number 2 of the will was not a substituted page but was the original page 2 of the will, and that the signature of the testator on page 2 of the will was not forged by Flanary but was the guided signature of the testator on the very instrument that was attested by the witnesses, it is difficult to see how the special verdict could have been further aided by the question whether the execution of the will by the testator, if it was executed by him, was the result of fraud practiced upon him by Flanary. The answers to the other questions answered that one.

Assignment No. 12 is asserted error in refusing appellant's instructions 1 to 24, inclusive. In the argument in support of this rather comprehensive and all-embracing assignment, the refused instructions are not referred to by number, and it becomes necessary to take them up in the order argued in appellant's brief. The first relates to the matter of presumptive fraud where an attorney deals with a client for the attorney's benefit. This has been referred to above with reference to instruction 12

as given. Inasmuch as this instruction must be considered in connection with several further assignments of error in the court's refusal to give other instructions requested by appellant, we here set forth instruction 12 in full. It is as follows:

"Undue influence in a case such as this means that degree of influence exercised by a person over the testator so as to destroy the wishes of the testator.

"When an attorney drafts a will for his client, and the will contains a gift to the attorney, the law raises a rebuttable presumption that the gift was the result of undue influence, which is a species of fraud, unless it appears by a preponderance of the evidence that the attorney drafted the will in accordance with instructions given him by the testator, and the will truly records the declaration of the testator's mind regarding his estate.

"The mere possession of influence and the opportunity and motive to exercise it are not sufficient to invalidate a will on the ground of undue influence, but it must appear, either directly or by justifiable inference from the facts proved, that the influence was exercised, so as to destroy the free agency of the testator and control the disposition of the property under the will."

We are satisfied that the refused instruction was included in the given instruction 12. The same applies to the refusal to give appellant's next three requested instructions, as well as five later ones.

The next refused instruction was as follows:

"If a person is laboring under senile dementia he is incapable of making a will." There was no such evidence of senile dementia as to justify this instruction. The court's refusal to give the instruction contained the notation: "Refused—decedent's mental and physical health was an issue of fact." Other instructions fully defined testamentary capacity.

The next two refused instructions, as well as a later one, concern the steps necessary to revoke a will. The subject was fully covered by other instructions, and these three instructions were properly refused.

The next refused instruction instructed that fraud

could be found on circumstantial evidence and that the contestant was entitled to the benefit of all reasonable inferences which might be reasonably and legitimately derived from established facts. The next was a similar instruction, which referred again to the presumption of fraud in cases of confidential relationship and the burden of proof to rebut the same. These were covered by other instructions, and properly refused.

The next refused instruction was as follows:

"The probability that a guided signature can be written by a feeble hand without a tremor or without interruptions and violent variations is very remote and adverse to experience. Arbitrary angles or erratic pen strokes may be certain evidence of the testator's resistance, indicating that the unwilling hand had been forced to write by the stronger guiding hand.

"Such factor would show the element of control, and not the genuine signature of the testator." The court refused it upon the ground that it was improper comment on the evidence. There was no error.

The court refused appellant's requested instruction as follows:

"If you should find that the signature on page 2 of the paper writing dated May 27, 1955 is a guided signature, then you must compare said guided signature with other signatures of Svante Peterson known to be genuine.

"If you should find that the character and quality of the guided is superior and better executed than could have been possible by Svante Peterson on May 27, 1955, such fact alone is sufficient to deny probate of the paper writing dated May 27, 1955." The ground of the ruling was that it was improper to control the deliberation of the jury and also that it amounted to a directed verdict. There was no error in the refusal.

Exception is taken to the court's refusal to give a definition of the phrase "to forge." It properly noted, without error, that a proper definition of forgery had been given.

The same situation existed in the court's refusal to instruct the jury: "A will cannot be established by merely showing the intent to make one."

The same applies to a requested instruction as to how a valid signature to a will may be made by another person other than the testator. The complete statutory requirement was contained in another instruction.

Two further requested instructions concerning undue influence were properly refused for the same reason.

The court refused the following requested instruction:

"You are instructed that it requires much less influence to control the will of a person of weak mind and infirm purpose than one of vigorous intellect and determined character." In refusing to give this instruction the court noted: "Improper comment on evidence—jury deemed to have common sense." We could not suggest a better valid reason for rejecting the instruction.

The foregoing disposes of the assignment of error in the court's refusal to give appellant's requested instructions 1 to 24, inclusive.

## MISCONDUCT ON PART OF JURY

Appellant asserts that a reversal must result from alleged misconduct of the jury as shown by the affidavits of two of the jurors containing the following allegation:

"That the jury, being overly tired, deliberated in haste and due to the long trial and the Christmas Season were eager to get home to their families and did not give due consideration to the case which the case should have had."

Appellant does not support this assignment of error with any authorities. No treatment of this subject in the decisions or texts appears to recognize such a situation as coming within any rule warranting an order for mistrial, or for reversal of a judgment based on jury verdict. Fernandez v. Consolidated Fisheries, Inc., 117 Cal.App.2d 254, 255 P.2d 863; 31 Am.Jur., Jury, sec. 66, p. 64. Irrespective of this, however, it is the well-recognized rule in this state, both in criminal and civil cases, that

jurors will not be thus permitted to impeach their own verdict. Pinana v. State, 76 Nev. 274, 352 P.2d 824.

In Southern Nevada Gold & Silver Mining Co. v. Holmes Mining Co., 27 Nev. 107, 145, 73 P. 759, 762, appellant produced affidavits of two jurors tending to show that the jury reached a quotient verdict. The court stated:

"At common law, affidavits of jurors could not be received to impeach their verdict, but could be admitted in its support. * * * 'There are reasons of public policy why jurors should not be heard to impeach their verdict, * * * If it were otherwise, but few verdicts could stand' * * *.

"The following reasons are given * * *: '(1) Because they would tend to defeat their own solemn acts under oath. (2) Because their admission would open a door to tamper with jurymen after they had given their verdict. (3) Because they would be the means, in the hands of the dissatisfied juror, to destroy a verdict at any time after he had assented to it.' "

The trial court properly rejected this assignment made in support of appellant's motion for new trial.

### Denial of New Trial

Errors asserted in the court's denial of appellant's motion for new trial are all embraced within the matters herein discussed, and are all covered by the conclusions above reached.

The briefs contain other matters not discussed in this opinion. All such other matters have had our consideration but do not require further comment.

Affirmed with costs.

Pike and McNamee, JJ., concur.